KANSAS-NEBRASKA NATURAL GAS COMPANY, INC., a Corporation, *Appellant*, v. STATE CORPORATION COMMISSION OF THE STATE OF KANSAS, JEFF A. ROBERTSON, Chairman and Commissioner, DE-WITT M. STILES, Commissioner, and CHARLES M. WARREN, Commissioner, as members of the State Corporation Commission of the State of Kansas, and their respective successors in office, *Appellees*.

Opinion filed October 7, 1950.

No. 37,920

NORTHERN NATURAL GAS COMPANY, a Corporation, *Appellant*, v. THE STATE CORPORATION COMMISSION OF THE STATE OF KANSAS and JEFF A. ROBERTSON, Chairman, DEWITT M. STILES, Member, CHARLES M. WARREN, Member of said Commission, and their successors in office, *Appellees*.

Opinion filed October 7, 1950.

No. 37,924

PANHANDLE EASTERN PIPE LINE COMPANY, a Corporation, *Appellant*, v. THE STATE CORPORATION COMMISSION OF THE STATE OF KANSAS, JEFF A. ROBERTSON, Chairman and Commissioner, DE-WITT M. STILES, Commissioner, and CHARLES M. WARREN, Commissioner, as members of the State Corporation Commission of the State of Kansas, and their respective successors in office, *Appellees*.

Opinion filed October 7, 1950.

(222 P. 2d 704)

*M. F. Cosgrove,* of Topeka, argued the cause, and *James D. Conway,* of Hastings, Neb., and *D. B. Lang,* of Scott City, were with him on the briefs for the appellant Kansas-Nebraska Natural Gas Company, Inc.

*Mark H. Adams,* of Wichita, argued the cause, and *Lawrence I. Shaw,* of Omaha, Neb., and *A. M. Fleming,* of Garden City, were with him on the briefs for the appellant Northern Natural Gas Company.

*Louis R. Gates,* of Kansas City, argued the cause, and *Mark H. Adams,* of Wichita, and *Edw. H. Lange,* of Kansas City, Mo., were with him on the briefs for the appellant Panhandle Eastern Pipe Line Company.

*Jay Kyle,* general counsel, State Corporation Commission, of Topeka; *R. C. Woodward,* special counsel, of El Dorado, and *Howard T. Fleeson* and *Dale M. Stucky,* both of Wichita, of counsel, argued the cause and were on the briefs for the appellees.

The opinion of the court was delivered by

HARVEY, C. J.: These consolidated appeals are from judgments of the district court, which upon review of an interim order of the State Corporation Commission fixing a minimum price of eight cents per thousand feet at the wellhead for natural gas taken from

the Hugoton gas field, found the same lawful and reasonable and directed their enforcement.

What is commonly spoken of as the Hugoton gas field is approximately sixty miles long and forty miles wide, covering parts of several counties situated in the southwest corner of Kansas and extending south across Texas county, Oklahoma, and into one or more counties of northern Texas. We are concerned here with only that part of the Hugoton gas field which is in Kansas. It is said to be the largest known reservoir of natural gas and is found at a depth of from about 2,600 to 2,900 feet in a porous formation about fifty feet thick. It was discovered near Hugoton in 1922, but it was not until about 1929 that its possibilities for domestic and industrial purposes had been fully realized. At the time of the hearing before the commission about 1,000 wells had been drilled and pipe lines had been laid to convey the gas to many cities and communities in Kansas and also in Colorado, Nebraska and states north, as far as Minneapolis, and east to cities in Michigan and points between. Several million feet of natural gas per day were being taken from the wells. The supply was greatly in excess of the market demands. Many of the producers had not been able to market their gas through any of the pipe lines. Prices being paid to producers varied from four to eight cents per thousand cubic feet. There was really no open market for it—the producers had to accept what the pipe line companies would offer to pay.

On February 6, 1948, the Southwest Kansas Royalty Owners Association, a nonprofit corporation composed of about 1,200 members and eighteen individuals, each the owner of mineral interests in real property in the Hugoton gas field, filed a petition with the corporation commission which alleged that under the land owned by the petitioners and others is the natural gas reservoir and source of supply known as the Hugoton gas field, which constitutes a natural resource which should be conserved and the waste of which should be prohibited by the commission, and stated particulars not necessary to be noted here in view of an amended petition in which it was alleged that preventable waste existed. The petition was received and given docket No. 35,154-C (C-1868 Conservation Division). Each of the appellants here intervened and filed a written protest, and the Cities Service Gas Company filed a motion to dismiss. After due notice to all interested parties a pretrial hearing was had July 19 and 20, 1948, of oral and written arguments as to the legal questions involved, including jurisdiction of the commission, during which the

petitioners were given leave to file an amended petition, and a date was fixed for the hearing of evidence, the commission reserving its ruling upon the legal questions. The amended petition was filed August 4, 1948. Hearings were had from October 18 through the 22d and December 13 through the 15th, at which evidence was offered. On February 18, 1949, the commission filed its interim order, which sufficiently sets forth the questions presented by the amended petition and the ruling of the commission thereon, the pertinent portions of which are as follows:

The interim order recited the consideration of the evidence and the arguments and briefs of counsel, the filing of the petition and amended petition, and stated that the petitions, as amended, "requested that the commission:

"(a) Institute an investigation into the issues raised by the Amended Petition,

"(b) Establish a uniform minimum price at which gas may be taken out of the producing structures in the Hugoton Field in Kansas of not less than 10¢ per M. C. F.,

"(c) Require all purchasers and takers of gas in and from the Hugoton Field to take ratably from each completed well in the field,

"(d) Establish atmospheric pressure as the base for measurement of the natural gas taken from the Hugoton Field."

Paragraph 2 recites the hearings and notices therefor, and

"At the conclusion of these proceedings, all of the questions of fact and of law were taken under advisement by the Commission.

"3. Gas Conservation Rule 82-2-201 of this Commission is state-wide in its application. Among other terms, it defines 'Gas, Cubic Foot' as the volume of gas required to fill one cubic foot of space at a temperature of 60 degrees Fahrenheit and under an absolute pressure of 16.4 pounds. To provide for a different pressure base in the Hugoton Basic Order would require amendment of this state-wide rule. These proceedings, notices as applicable only to the Kansas Hugoton Field, are not competent to affect an amendment to a state-wide rule or regulation. The Commission, having so limited this inquiry, is without jurisdiction here to establish a pressure base differing from the base set forth in the above noted Gas Conservation Rule. However, issues fairly raised in this proceeding make it appear to the Commission that an investigation on a state-wide basis should be initiated to determine whether Rule 82-2-201 should be amended and the Commission is this day entering its order in Docket No. 34780-C (C-1825) instituting such an investigation.

"4. The Commission has jurisdiction and authority to determine the value of gas at the wellhead in the Kansas Hugoton Field and to require that no gas may be taken out of the producing structures unless the takers of such gas attribute such value to the gas for purposes of payment to the producer, landowner, lease-holder, or royalty owner, and to fix a minimum wellhead price

at which natural gas may be taken from the Kansas Hugoton Field, when such determination and requirement or fixing of price is a necessary or appropriate means of giving effect to the intent and purpose of the statutes relating to the production and conservation of natural gas (G. S., 1947 Supp., 55-701 to 55-713, incl.) . . .

"5. The record in this proceeding does not explore fully all the factors which the Commission deems it necessary to consider in arriving at a final determination as to the value of gas at the well-head in the Kansas Hugoton Field or as to what minimum wellhead price should be fixed for the sale of natural gas. To secure the further information it requires, the Commission is this date, on its own motion, entering its order instituting an investigation in Docket No. C-164. However, undisputed evidence now before the Commission in this record establishes that in order to give effect to all the intents and purposes of the statutes relating to production and conservation of natural gas, it is necessary and appropriate for the Commission to determine, pending completion of the investigation today instituted in Docket No. C-164, that the fair and reasonable value of natural gas at the wellhead in the Hugoton Field is at least eight cents per thousand cubic feet, and that the taking of gas out of the field without attributing such value thereto for purposes of payment to the producers, landowners and royalty owners is not conducive to the fulfillment of the intents and purposes of the statute relating to the production and conservation of natural gas and should be prevented. .

"6. No person, firm or corporation taking gas from the Hugoton Field should take or cause such gas to be taken out of the producing structures or formations thereof without attributing thereto for purposes of payment to the producers, landowners, leaseowners and royalty owners a fair and reasonable value at the well-head of at least eight cents per thousand cubic feet of gas."

Paragraph 7 pertains to the keeping of books of gas taken from the field and provides:

"Pending completion of the investigation in Docket No. C-164 instituted today, which investigation may result in modification of the determination of the value of gas, . . ."

It further provides that those taking the gas should be required to make actual payments of the differences to the persons entitled thereto. or deposit or impound the funds in their own treasury or give bond for such payment.

"8. It is not established in the record now considered that ratable-taking within the meaning of the statutes above referred to is not being accomplished. It has been strongly urged by the applicants herein that the Basic Order for the Kansas Hugoton Field does not require purchasers within that field to take ratably from each developed well. The Commission's desire to fulfill completely the purpose and intent of the laws relating to the production and conservation of natural gas prompts it to explore more fully the conditions and circumstances related to applicants' contentions. It is, therefore, entering its order in Docket No. C-164 instituting an investigation to determine whether the Basic Prora-

tion Order, applicable to the Hugoton Field, should be amended to further insure ratable-taking within the meaning of the gas conservation laws.

"It Is, Therefore, by the Commission Ordered: That from and after the effective date of this order and until the further order of the Commission in this docket or in Docket No. C-164 following or in the course of the investigation today instituted:

"1. No person, firm or corporation taking gas from the Hugoton Field shall take or cause such gas to be taken out of the producing structures or formations thereof without attributing thereto for purposes of payment to the producers, landowners, leaseowners and royalty owners a fair and reasonable value at the wellhead of not less than eight cents per thousand cubic feet. . . .

"4. This order shall take effect and be enforced from and after 12:01 A. M., March 1, 1949, and shall remain in force and effect until the further order of this Commission.

"The Commission hereby retains jurisdiction of this cause and of the subject matter and the parties hereto for such other and further orders as the circumstances may require."

On the date the commission filed its interim order in docket No. 35,154-C (C-1868) it made an order in docket No. C-164 by which it determined, on the commission's own motion, that an investigation should be instituted to develop and explore all the facts and circumstances pertinent to a determination of the value of gas at the wellhead in the Kansas Hugoton gas field and as to what minimum wellhead price should be fixed for the sale of such gas, hearings pursuant to such investigation to be held upon proper notice at such times and places as the commission might order.

On February 23, 1949, the commission filed its memorandum opinion, setting out its reason for making the interim order. This included a history of the proceeding, of our legislative history relating to the production and conservation of natural gas, and the history of the development of the Hugoton gas field, and found authority for its interim order in our statute (G. S. 1947 Supp. 55-701 to 55-713). The commission on the same date issued an order in docket No. C-164 by which, on its own motion, it instituted an investigation, with hearings to be held thereon after due notice, for the purpose of determining whether existing orders, rules and regulations were sufficient in scope to require ratable taking from each and every well in the field, and whether, under existing orders, rules and regulations, it was necesary to make amendments, alterations and changes therein for the protection of correlative rights, conservation of natural gas, orderly development of the field, ratable taking, and for such other purposes as might be deemed necessary. On the same date the commission, on its own motion, made an

order in docket No. 34,780-C (C-1825) for further consideration of the unit of measurement known as "Gas Cubic Foot," defined in rule 82-2-201 of the general rules and regulations for the conservation of crude oil and natural gas.

Each of the appellants filed a motion for rehearing, which motions were considered by the commission and overruled. Whereupon the appellants filed their respective actions for judicial review of the interim order of the commission by the district court, as provided in G. S. 1947 Supp. 55-606, as authorized by 55-707. These actions were heard together by the district court on September 12 and 13, 1949, and taken under advisement by the court. On September 24, 1949, the district court made its findings and judgment in each of the actions as follows. The court found:

"1. That the Interim Order entered by the State Corporation Commission of the State of Kansas, one of the defendants herein, in its Docket. 35154-C (C-1868) on the 18th day of February, 1949, was a lawful and reasonable order.

"2. That said Interim Order here before this court on a petition for review under G. S. 1947 Supp., 55-707, should be upheld and sustained.

"It Is Therefore by the Court Ordered, Adjudged and Decreed that said Interim Order entered by The State Corporation Commission of the State of Kansas, one of the defendants herein, in its Docket 35154-C (C-1868) on the 18th day of February, 1949, be and the same is hereby upheld and sustained. That the costs of review in this court be assessed to the plaintiff.

"Ray H. Calihan, District Judge."

Each of the plaintiffs filed a motion for a new trial in the district court, which was considered by the court and overruled, and each of them timely appealed to this court, where the cases were consolidated for hearing.

We turn now to the consideration of the legal questions presented. Appellants contend that since they are engaged in the business of transporting natural gas in interstate commerce they are governed wholly by the Federal Natural Gas Act of June 21, 1938 (Ch. 556, 52 Stat. 821, 15 U. S. C. A., § 717). This is "AN ACT To regulate the transportation and sale of natural gas in interstate commerce, and for other purposes." It first declares the "necessity for regulation of natural-gas companies," contains a declaration of policy, and specifies the application of its provisions with exemptions thereto. The pertinent portions read:

"Section 1. (a) As disclosed in reports of the Federal Trade Commission made pursuant to S. Res. 83 (Seventieth Congress, first session) and other reports made pursuant to the authority of Congress, it is hereby declared that the business of transporting and selling natural gas for ultimate distribution to the public is affected with a public interest, and that Federal regula-

tion in matters relating to the transportation of natural gas and the sale thereof in interstate and foreign commerce is necessary in the public interest.

"(b) The provisions of this Act shall apply to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural-gas companies engaged in such transportation or sale, *but shall not apply to any other transportation or sale of natural gas or to the local distribution of natural gas or to the facilities used for such distribution or to the production or gathering of natural gas."* (Emphasis supplied.)

The question appears to have been settled in *Federal Power Com'n v. Panhandle Eastern Pipe Line Co.,* 172 F. 2d 57. There Panhandle (the appellant here in No. 37,924) in September, 1948, organized the Hugoton Producing Company, transferred to it gas leases on 97,000 acres of land in the Hugoton gas field in Kansas reserving the option to purchase gas produced therefrom after a date named, paid Hugoton $675,000 in cash and took back from it all of its outstanding capital stock, which it undertook to distribute in dividends to its stockholders. The Federal Power Commission sued to enjoin the transfer because its approval of the transaction had not been obtained. From an adverse decision in the district court it appealed. The United States Circuit Court of Appeals, third circuit, affirmed, and in the opinion (by Goodrich) used the following language:

"The controversy here arises out of the statute known as the Natural Gas Act passed in 1938. That statute by its first section declares that federal regulation in the matters of transportation of natural gas and the sale thereof in interstate and foreign commerce is necessary in the public interest. There is no doubt that Panhandle is transporting and selling natural gas in interstate commerce and that under section 1 of the Act such transportation and sale by the company are subject to its provisions. The last sentence of the first section of the statute, however, carves out from the subject matter to be regulated a very important exception. The words are: '. . . but shall not apply to any other transportation or sale of natural gas or to the local distribution of natural gas or to the facilities used for such distribution or to the production or gathering of the natural gas.' 15 U. S. C. A. § 717 (b). . . .

"That there is a connection between the handling of matters in a local gas field and interstate transportation and sale of gas cannot be denied. No doubt Congress could have gone much further than it did in fixing the scope of federal regulation. But it clearly and intentionally drew a line short of where it could have gone."

On certiorari this was affirmed in Federal Power Com'n v. Panhandle Co., 337 U. S. 498, 69 S. Ct. 1251, 93 L. Ed. 1499 where it was held:

"1. Section 1 (b) of the Natural Gas Act, excluding 'the production or gathering of natural gas' from the Commission's jurisdiction, left the transfer of gas leases to state regulation and outside the scope of the Commission's regulatory powers.  Pp. 502-505."

In the opinion (pp. 509-513) it was said:

"The legislative history of this Act is replete with evidence of the care taken by Congress to keep the power over the production and gathering of gas within the states.  This probably occurred because the state legislatures, in the interests of conservation, had delegated broad and elaborate power to their regulatory bodies over all aspects of producing gas.  (See, for example, Kansas Gen. Stat. §§ 55-701 to 55-713 (1947) Supp.); Mich. Stat. Ann., c. 97, §§ 13.138 (1)-13.140 (10) Supp. 1947); Okla. Stat. Ann., tit. 52, c. 3, §§ 81-247; Texas Rev. Civ. Stat., tit. 102, Art. 6008 et seq.  (Vernon, 1925, with Supp. 1948); La. Gen. Stat. §§ 4766-4826.2)  The Natural Gas Act was designed to supplement state power and to produce a harmonious and comprehensive regulation of the industry. Neither state nor federal regulatory body was to encroach upon the jurisdiction of the other.  Congress enacted this Act after full consideration of the problems of production and distribution.  It considered the state interests as well as the national interest.  It had both producers and consumers in mind.  Legislative adjustments were made to reconcile the conflicting views."

These deccisions have not been set aside or modified.  From them and from the statute itself it is clear that the Federal Natural Gas Act has no application to intrastate transportation or sale of natural gas, or to its local distribution, or to its production, or gathering. Certainly it was not designed to limit or destroy the authority of states in which natural gas is found to conserve natural gas and to prevent waste in its production, gathering, distribution or sale. . Congress made it clear such a result would not follow, and in doing so took cognizance of the specific Kansas statute here involved and of statutes of other states designed to conserve natural gas and to prevent waste in its production, gathering, distribution or sale.

Appellants contend the legislature has not given the commission authority to fix a wellhead price for natural gas.  We wish to make it clear that appellants do not contend the state has no authority to fix such a price when it deems such action necessary to conserve natural gas, by a direct act of the legislature, or by an act specifically authorizing the commission to do so.  Indeed, we interpret their position as conceding the state has such authority.  Hence, there is no purpose or necessity in discussing such authority here.  We do no more than refer to the fact that as early as 1904, in *La Harpe v. Gas Co.,* 69 Kan. 97, 76 Pac. 448, it was held:

"The production and distribution of natural gas for light, fuel and power is a business of a public nature, the control of which belongs to the state."

That doctrine has inhered in our subsequent statutes and decisions.

Our first statute dealing specifically with "the production and conservation of natural gas" was enacted in 1935 (Ch. 213, Laws 1935) and was embodied in our General Statutes of 1935 as sections 55-701 to 55-711. The statute was rewritten in 1945 (Ch. 233, Laws 1945) and now appears in G. S. 1947 Supp. as sections 55-701 to 55-713. The pertinent portions of the statute may be quoted or summarized as follows:

"That the production of natural gas in the state of Kansas in such manner and under such conditions and for such purposes as to constitute waste is hereby prohibited. (G. S. 1947 Supp. 55-701.)

"That the term 'waste' as herein used, in addition to its ordinary meaning, shall include economic waste, underground waste and surface waste. Economic waste as used in this act, shall mean the use of natural gas in any manner or process except for efficient light, fuel, carbon black manufacturing and repressuring, or for chemical or other processes by which such gas is efficiently converted into a solid or a liquid substance. The term 'common source of supply' wherever used in this act, shall include that portion lying within this state of any gas reservoir lying partly within and partly without this state. The term 'commission' as used herein shall mean the state corporation commission of the state of Kansas, its successors, or such other commission or board as may hereafter be vested with jurisdiction over the subject matter of this act. (G. S. 1947 Supp. 55-702.)

"That whenever the available production of natural gas from any common source of supply is in excess of the market demands for such gas from such common source of supply, or whenever the market demands for natural gas from any common source of supply can be fulfilled only by the production of natural gas therefrom under conditions constituting waste as herein defined, or whenever the commission finds and determines that the orderly development of, and production of natural gas from, any common source of supply requires the exercise of its jurisdiction, then any person, firm or corporation having the right to produce natural gas therefrom, may produce only such portion of all the natural gas that may be currently produced without waste and to satisfy the market demands, as will permit each developed lease to ultimately produce approximately the amount of gas underlying such developed lease and currently produce proportionately with other developed leases in said common source of supply without uncompensated cognizable drainage between separately-owned, developed leases or parts thereof. The commission shall so regulate the taking of natural gas from any and all such common sources of supply within the state as to prevent the inequitable or unfair taking from such common source of supply by any person, firm or corporation and to prevent unreasonable discrimination in favor of or against any producer in any such common source of supply. . . . (G. S. 1947 Supp. 55-703.)

"The commission shall promulgate such rules and regulations as may be necessary for the prevention of waste as defined by this act, the protection

of all water, oil or gas-bearing strata encountered in any well drilled in such common source of supply, ascertaining the several factors entering into the determination of the productive capacity of each well, the total productive capacity of all wells in the common source of supply, the establishment of such other standard or standards as the commission may find proper to determine the productive capacity of each well and of all wells in such common source of supply, and as the commission may find necessary and proper to carry out the spirit and purpose of this act: . . ." (G. S. 1947 Supp. 55-704.)

Other provisions of the statute pertain to procedure and other details which are not in question.

The dominant purpose of this statute is to prohibit waste of natural gas in Kansas, not only in the manner and under the conditions of its production, but for such purposes as would constitute waste. In order that the term "waste" should not be narrowly construed the statute makes it clear that it is to include economic, underground and surface waste, and the term "economic waste" is defined. These provisions were for the purpose, if necessary, of expanding the meaning of the term "waste" and not for the purpose of limiting such meaning. The statute also deals with the rights of owners of property under which there is a common source of supply of natural gas. We think the statute is broad enough to authorize the commission to make any rule or order to prohibit waste of natural gas, upon proper application made to it, if the evidence discloses waste in the manner or conditions or purpose of its production. It is true the statute did not specifically authorize the commission to fix a wellhead minimum price to be paid for gas produced. It did not forbid the commission to do so if and when the evidence disclosed the fixing of such price would tend to prevent waste and the inequitable and unfair taking of gas from a common source of supply. Hence, the legal question presented by appellants, that the statute did not authorize the commission to make the interim order complained of, is not well taken.

We shall not attempt a detailed recital of the evidence upon which the commission apparently relied in fixing a minimum wellhead price of eight cents per thousand cubic feet of gas to be taken from the Hugoton field. The testimony is lengthy and explained or illustrated by numerous maps, charts and tables of figures. The witnesses who testified upon the subject were well educated along those lines and had years of experience in the production and marketing of gas and economics as applied thereto, and were outstanding writers upon that subject. Their qualifications were not questioned, neither

was there any contention that any of them in any way was biased or prejudiced. They gave it as their judgment that one of the best ways to conserve gas and prevent waste in the Hugoton gas field is to fix a minimum wellhead price for gas. The lowest figure stated by any of them was eight cents per thousand cubic feet. Others put the minimum figure higher. This evidence was not contradicted by the appellants. They appear to have presented their defense before the commission and the trial court, and their appeal here is upon legal questions and not upon questions of fact. We think the commission was justified in finding upon the evidence before it that to prevent waste of gas in the Hugoton field a minimum wellhead price of eight cents per thousand cubic feet was justified, and that the trial court correctly found the order of the commission in this respect to be reasonable. We take note of the fact that the commission did not regard this as a final order. The order was made upon the evidence then before the commission, which on its own motion transferred the matter to docket No. C-164 for further study.

Appellants contend the order of the commission constitutes a special law, being limited solely to the Kansas Hugoton gas field, and therefore violates section 17, article 2, of our constitution, which reads:

"All laws of a general nature shall have a uniform operation throughout the state; and in all cases where a general law can be made applicable, no special law shall be enacted; and whether or not a law enacted is repugnant to this provision of the Constitution shall be construed and determined by the courts of the state."

This provision of our constitution was intended to apply to laws enacted by the state legislature. Appellants contend it has been held to apply to any law purporting to be made by public authority and cite some authorities from other jurisdictions tending to support that view. No case in Kansas is cited as supporting that view under our constitution. But we need not decide that question here. The court takes judicial notice of the fact that the Hugoton gas field in Kansas differs in many respects from any other gas field in the state. We think the order is not void because it applies only to the Hugoton gas field.

Appellants contend the order contravenes the interstate compact to conserve oil and gas (G. S. 1935, 55-803 to 55-808 incl.) as extended. The point is not well taken. The declared purpose of the compact, as stated in Article II thereof, is "to conserve oil and gas by the prevention of physical waste thereof from any

cause." And in Article III, after listing six particulars in which the states joining in the compact agreed to enact laws or to continue them in force for the prevention of waste, contains this language: "The enumeration of the foregoing subjects shall not limit the scope of the authority of any state." We see nothing in the compact that would prevent our state from enacting the statutes under which the commission operated.

Appellants contend the interim order complained of violates their existing contracts for the purchase of gas. The point is not well taken. Appellants obtain the gas which they pass through their pipe lines in one of two ways—by purchase or by production. The standard form gas purchase contract used by the appellants in the Hugoton gas field contains this clause:

"Contract subject to present and future orders, rules and regulations of duly constituted authorities having jurisdiction."

By this the parties anticipated modification of the contract by a duly constituted authority having jurisdiction. Under our previous holdings herein the corporation commission is such a body. The appellants get some of the gas from wells under ordinary gas leases with the owners of real property. These leases do not attempt to fix any price for the lessor's royalty. The pertinent provision in the lease reads:

"The lessee shall monthly pay lessor as royalty on gas marketed from each well where gas only is found, one-eighth (⅛) of the proceeds if sold at the well, or if marketed by lessee off the leased premises, then one-eighth (⅛) of its market value at the well."

The result is the appellants have no prior contracts which will be violated by the order complained of here.

Other points argued by the appellants have been considered and found to be without substantial merit.

The judgment of the trial court is affirmed.

PRICE, J. (dissenting) : I am unable to agree to the result reached in the opinion written for the court and will state my views very briefly.

In doing so I do not propose to debate the merits of the question whether the commission should or should not have power to fix the price of natural gas at the wellhead in the Hugoton or any other gas field. As I see it the question is—*does it possess such power under the statute?* The commission has only such powers as have been conferred upon it by the legislature. Nowhere in

the provisions of G. S. 1947 Supp. 55-701, 702, 703 and 704 do I find any such authority granted. In fact, at the 1947 session of the legislature H. B. 129 specifically empowered the commission ". . . to fix a minimum price at which gas may be purchased at the wellhead. . . ." It is true that this bill, which passed both houses of the legislature, was vetoed by the governor and therefore did not become a part of our law—but, in my opinion, it was definitely a legislative recognition of the fact that no such power previously existed. In the absence of such statutory authority I am unwilling to say that an administrative agency, board or commission possesses the power to do what was done here and for that reason I think the order of the commission was unlawful and should be set aside.

WEDELL, J., concurring in J. Price's dissent.