No. 45,591

CITIES SERVICE OIL COMPANY, *Appellant,* v. THE STATE CORPORATION COMMISSION OF KANSAS, (Dale E. Saffels, Chairman; Jules V. Doty and James O. Greenleaf, as members of said Commission and their Respective Successors in Office), *Appellee,*

and

ASHLAND OIL & REFINING COMPANY; COLORADO INTERSTATE GAS COMPANY; SINCLAIR OIL & GAS COMPANY; PANHANDLE EASTERN PIPE LINE COMPANY; PAN AMERICAN PETROLEUM CORPORATION; and NORTHERN NATURAL GAS COMPANY, *Intervenor-Appellees.*

(472 P. 2d 257)

Opinion filed July 17, 1970.

*Richard C. Byrd,* of Anderson & Byrd, of Ottawa, argued the cause, and *Alfred O. Holl,* of Bartlesville, Okla., was with him on the briefs for the appellant.

*Jack Glaves,* of Topeka, argued the cause, and *David J. Berkowitz,* of Topeka, was with him on the brief for the appellee state corporation commission.

*Gerald Sawatzky,* of Foulston, Siefkin, Powers & Eberhardt, of Wichita, argued the cause, and *Stuart R. Carter* of the same firm was with him on the separate briefs for intervenor-appellees Ashland Oil & Refining Company and

Sinclair Oil & Gas Company, and for intervenor-appellee Colorado Interstate Gas Company, division of Colorado Interstate Corporation.

C. C. Linley, of Liberal, argued the cause, and Wendell J. Doggett, of Houston, Texas, was with him on the brief for intervenor-appellee Panhandle Eastern Pipe Line Company.

Glenn D. Young, Jr., of Lilleston, Spradling, Gott, Stallwitz & Hope, of Wichita, and Guy T. Buell and Gordon D. Ryan, both of Fort Worth, Texas, were on the brief for intervenor-appellee Pan American Petroleum Corporation.

Floyd E. Jensen and Robert Hall, of Adams, Jones, Robinson and Manka, of Wichita, were on the brief for intervenor-appellee Northern Natural Gas Company.

The opinion of the court was delivered by

HARMAN, C.: This is an action for judicial review of a state corporation commission order denying an application to amend the basic proration order governing production of natural gas in the Kansas Hugoton gas field.

The basic order, dated March 21, 1944, and thereafter amended on various occasions, allocates production of natural gas from wells in the field on the basis of computations made under that which is commonly known as an adjusted deliverability formula. Essentially, the amendment proposed by the applicant, Cities Service Oil Company (hereinafter called Cities or appellant) would substitute that which is called a reserve index formula.

Cities, the owner and operator of gas leases in the Kansas Hugoton field, filed the application with the commission February 8, 1965. Highly summarized, it alleged the field is now virtually fully developed and contains 3,955 wells on which accurate production and pressure records have been maintained; in recent years mechanical means have been employed in varying degrees in some wells to stimulate and increase deliverability with the result that under the present formula inequities have resulted in gas allowables; due to disproportionate deliverabilities resulting from stimulation, not all leases will be able ultimately to produce the approximate amount of gas underlying them in proportion with other developed leases in the field. It asked that the formula be amended so as to conform to the legislative mandate (K. S. A. Chap. 55, Art. 7).

A prehearing conference of interested parties was held March 11, 1965, as a result of which the commission entered its order limiting the scope of the proceedings as follows:

"3. The Commission finds, upon consideration of the motions and briefs filed herein and the statements of counsel appearing herein, that only such historic and technical evidence as is necessary to support or rebut any proposed proration formula should be admissible in this hearing.

"4. The Commission further finds that any evidence pertaining to the determination of market demand, tolerance and shut-in provisions, cancellation of underages, well spacing, minimum allowables, and physical testing of the wells in the field are not properly within the scope of this hearing and should not be admitted into the record.

"IT IS, THEREFORE, BY THE COMMISSION ORDERED: That the scope of the hearing on the application above referred to be and it is hereby limited as set out in Findings (3) and (4) of this order.

"The Commission retains jurisdiction of the subject matter and the parties for the purpose of entering such further order or orders as from time to time it may deem proper."

No objection or complaint has ever been lodged against this order.

Thereafter extensive hearings were had at which twenty-six oil and gas companies, who were producers and purchasers in the field, and the Southwest Kansas Royalty Owners Association appeared. The commission on October 4, 1967, issued its order denying the application. Cities then filed its petition for judicial review in the district court of Finney county. January 8, 1968, that court remanded the matter to the commission for more specific findings. January 19, 1968, the commission made further findings of facts and conclusions of law and again denied the application. March 8, 1968, Cities again filed its petition for judicial review in the Finney county district court.

The appellees are the corporation commission and other producing companies in the field (named as such in the caption of this opinion) who have intervened adversely to appellant's position and have remained in the litigation to this stage.

Certain of the appellee producers maintain the commission's order is not subject to judicial review because no appeal has been taken from any of the commission's proration orders actually fixing allowables for the wells in the field and no such orders are before the court for review. They rely on certain language used by this court in *Hayward v. State Corporation Comm.,* 151 Kan. 1008, 101 P. 2d 1041, and *Colorado Interstate Gas Co. v. State Corporation Comm.,* 192 Kan. 1, 386 P. 2d 266, cert. den., 379 U. S. 131, 13 L. ed. 2d 333, 85 S. Ct. 272.

In *Hayward* the corporation commission appealed from a stay order in the nature of a temporary injunction granted by a district

court in which that court prohibited the commission from enforcing the original basic gas proration order proposed for the Hugoton field. The basic order was designed to form the standard pursuant to which the commission would fix allowable production for individual wells. The district court granted the stay order on the theory enforcement of the basic proration order and subsequent acts to be performed by the commission pursuant thereto would result in irreparable injury to the plaintiff land and royalty owners. The court's finding of irreparable injury was based upon estimates, presumptions and predictions of witnesses as to what the scheduled allowables to be fixed by the commission probably would be. This court merely held the stay order was prematurely and improvidently granted inasmuch as the commission alone had the statutory right and duty to promulgate the schedule of allowables, that this was a legislative function which had not been performed and, until performed, could not be stayed or enjoined.

In *Colorado Interstate* the commission, in contemplation of a change in the method of determining market demand (the starting point in the process of fixing well allowables), instituted show cause proceedings directing purchasers of gas in the Hugoton field to furnish certain information considered relevant to that determination. Formerly the only factor considered was nominations of the purchasers, with the result a major purchaser could reduce its take and force reduction on every other purchaser in the field regardless of market demand requirements as a whole. Based upon the new information the commission compiled a report and an order to become effective February 1, 1958. A district court reviewed the order and found it void. Upon appeal this court indicated the commission's order was not subject to judicial review because it stated only formulae factors and policy to be followed in the future and future commission action was necessary before the order could have any effect.

The factual difference between these two cases and the case at bar is readily apparent—in the cited cases there had been no experience and nothing had happened under the new proposals affecting anyone's rights; speculation was largely the basis for challenge—here the order sought to be amended has been in operation in establishing allowables over a considerable period of time and there is experience as to its effect. The rationale underlying that which was said in *Hayward* and *Colorado Interstate* makes

any holding there inappropriate under our present factual situation. The commission's denial order is subject to judicial review.

The same appellees further contend appellant is not an aggrieved party within the meaning of K. S. A. 55-606 making judicial review of corporation commission actions available to "any person aggrieved". The argument is the evidence of appellant's operations under the old formula falls far short of showing overall injury to or discrimination against it, and further, that appellant is acting under the guise of public interest only to accomplish something for its sister company, Cities Service Gas Company, a pipeline purchaser in this and other fields. Be that as it may, we think this argument approaches begging the question, that is, it assumes as proved the very thing in issue. Allowables are established for individual wells. Appellant owns and operates separate leases, and is properly concerned with its own correlative rights and those of other interest owners to whom it may be accountable for drainage.

We hold an owner and operator of gas leases is a proper party to have judicial review of an order denying an application to amend a basic proration order under which allowables for individual wells have been fixed, where allegedly the basic order fails to protect correlative rights in individual leases held or operated by such party.

Proceeding to the merits, we point out *Colorado Interstate* contains a comprehensive description of the Kansas Hugoton field, its uniqueness, and a history of proration therein which may furnish the interested reader further background for the problem here considered. Prior to presenting the findings which are under attack we should briefly mention several matters shown by the evidence but not particularly elaborated in those findings.

The adjusted deliverability formula essentially is based on a well's ability to produce into a pipeline against a specific back pressure, adjusted for the well's attributed acreage, each well being allocated an allowable in proportion to the total field allowables as its adjusted deliverability bears to the total adjusted deliverability of all wells. Each year the commission totals all shut-in wellhead pressures taken during that year and arrives at an average pressure for the field. Under the basic order 80% of this average wellhead pressure is the standard deliverability pressure, and each wellhead's pressure is compared with and measured against this figure. No well is assigned an allowable unless its shut-in wellhead pressure exceeds the standard deliverability pressure.

The reserve index formula proposed by appellant consists of a computation based on the five (later amended to seven or ten) most recent pressure points for each well, and the cumulative production history, extrapolated to 60 per cent of the Kansas-Oklahoma field average pressure existing at the time of each annual test. By this means, a projection is made of remaining recoverable gas which will be produced when the well's pressure declines to 60 per cent of the average pressure. This computation is called the well's reserve index. The sum of the reserve indexes of all wells is applied to determine a field allowable factor, which, when adjusted for allowable to minimum wells, is multiplied by the individual well's reserve index to determine the well's current allowable.

In a common reservoir gas migrates from high to low pressure. A well's pressure is directly responsive to its production rate.

Fracturing is the injection at varying high rates and pressures of volumes of liquids containing a propping agent into the producing formations immediately adjacent to the well bore. The pressure causes fractures in the formation which the propping agent enters and keeps open after the liquid is withdrawn. Fracturing has the effect of increasing the permeability of the producing formation in the vicinity of the well bore, thereby substantially increasing the well's deliverability. Wells in the field have been fractured, and in some instances refractured, in varying situations. The process has increased the field's recoverable reserves.

In the Kansas Hugoton field the thickness of the gas producing formations varies considerably, running from as much as 150 feet in the "fairway" to as little as twenty-five feet on the flanks of the field. The pay formations are not uniform as to porosity or permeability, resulting in different pressures, and, due to their size and proximity to the water zone, some cannot be safely or economically fractured at all and others cannot be subjected to high intensity fracturing. Water problems of poorer wells become increasingly severe as more gas is produced from them. Ten pipeline companies purchase the gas in the field and transport it to various parts of the United States under varying requirements.

The commission's findings and conclusions, the subject of this litigation, are as follows:

## "FINDINGS OF FACT"

"1. Since the generally accepted discovery well was drilled in 1927, approximately one third of the estimated recoverable reserves (21 to 25 trillion

cubic feet) had been produced as of January 1, 1965, at which time there were 3,956 gas wells producing and connected in the field.

"2. The Kansas portion of the Hugoton Field is presently being regulated under the provisions of the Basic Proration Order issued March 21, 1944, as amended. This basic order established allowables for wells on the basis of adjusted deliverability which is the ability of a well to produce against a specific back pressure adjusted for the well's attributed acreage.

"3. Recoverable reserves provide a better standard against which to measure the fairness of assigning allowables than does gas-in-place. This is particularly true around the edges of the field where water lessens the probability of producing a well to a zero abandonment pressure.

"4. The pressure decline method is the best method for estimating recoverable reserves in the Kansas Hugoton Field.

"5. In estimating recoverable reserves abandonment pressures will vary from well to well depending upon the circumstances.

"6. Under the present Basic Proration Order, as amended, the pressure control factor has caused the pressure to decline relatively uniformly. The reserve index formulas cannot exercise as good control of pressures between wells because they have weaker control factors (40% and 60%) because there is no uniformity of permeability in the field.

"7. Prior to 1965 no application had been filed to change the formula for the field.

"8. Prior to the advent of the workover process known as fracturing, the allowables assigned the wells in the field were in reasonable relationship to each well's recoverable reserves.

"9. Only since 1962 has the fracturing of wells caused a change in the individual well allowables. Most of the wells which experienced large volume, high rate fracture treatment have had their deliverability and resulting allowables increased.

"10. Those wells which have not been fractured have had their deliverability and resulting allowables decreased during this period of time.

"11. As of November, 1965, the Kansas Hugoton Field had accumulated underproduction of 331,636,135 MCF; Cities Service Gas Company had an accumulated underproduction of 298,239,396 MCF; there were 1,452 wells connected to the Cities Service Gas Company system; the accumulated underproduction charged to Northern, Panhandle, Colorado Interstate and Kansas Nebraska was 28,501,517 MCF.

"12. Although the limit of the permitted flexibility of operation was six times the January basic allowable, the Cities Service Gas Company connections were 11.8 times January underproduced as of November, 1965.

"13. Beginning January 1, 1964, the Commission has annually or semi-annually granted a moratorium on the cancellation of underages.

"14. The peak of the allowable displacement due to fracturing took place during 1964. Since that time deliverabilities, and their resulting allowables, have begun to adjust to the pre-1962 positions.

"15. Large volume high rate fracturing has appreciably diminished.

"16. Refracturing presents no immediate problem.

"17. The field's allowable imbalance is being corrected.

"18. Although there are disadvantages of the fracturing process, including the high cost, the possibility of fracturing into water and the drilling of replacement wells, the basic purpose of fracturing is to provide the bore hole with the best communication with the producing reservoir. Fracturing in many cases is necessary to counteract well bore damage to permit a well the opportunity to recover or to retain its fair share of the field allowable.

"19. Fracturing has increased the period of peak deliverability for several years and the field ultimate recovery has been substantially increased by permitting production at economic rates to a lower field abandonment pressure.

"20. With the adoption of the proposed reserve index formula, a well in a poor competitive position compared to its neighbors has little or no means to protect itself by well stimulation.

"21. If temporary derangement of allowable patterens results from fracturing, the present deliverability formula acts rapidly to equalize pressure.

"22. The proposed reserve index formula with its weaker pressure control factors (40% or 60%) and the weighting of seven or ten pressure points in the determination of allowables, will require relatively long periods to correct any pressure difference existing in the field.

"23. The current deliverability formula with a stronger 80% pressure control factor places full weight on the most recent pressure determination, and will act more rapidly to equalize well pressures throughout the field.

"24. Under the deliverability formula, if withdrawals from a well are proportionately in excess of the recoverable reserves of that well, the next pressure survey will show a larger pressure drop than experienced by the rest of the field. This will result in a proportionately lower deliverability and will result in lower allowables for subsequent proration periods until again tested.

"25. Conversely, reduced withdrawal by an individual well, if not in proportion to the recoverable reserves, will result in a subsequent higher pressure with a consequent higher deliverability and allowable for the subsequent proration periods.

"26. With this pressure control, inequities and withdrawals are rapidly corrected to maintain equalized pressures, and the deliverability formula thus provides each individual well an opportunity to recover its fair share of the field recoverable reserves.

## "CONCLUSIONS OF LAW"

"1. Prior to 1962 the allowables assigned the individual wells in the Kansas Hugoton Field were in reasonable relationship to recoverable reserves. During this period of time the deliverability formula was properly protecting correlative rights and preventing waste as required by the Kansas statutes. It is only since 1962 that there have been displacement of individual well allowables. The extent of the allowable displacement is best evidenced by the various exhibits introduced in this hearing. Part of the allowable displacement was caused by the fracturing of the wells connected to Cities Service Gas Company pipeline system. The new higher allowables caused Cities Service Gas Company to under-produce them which in turn increased well pressures and brought still higher allowables. The peak of the allow-

able displacement took place in the years 1963 and 1964. Since that time individual well deliverability and allowables have begun to adjust to their pre-1962 position. If allowed to continue, the deliverability formula will correct inequities thereby giving each well the opportunity to ultimately produce the recoverable reserves underlying its attributed acreage and to currently produce proportionately with the other wells in the field without cognizable uncompensated drainage.

"2. Well stimulation has been advantageous to the Kansas Hugoton Field. It has made commercial reserves from those which were non-commercial prior to fracturing. It has permitted the restoration of older wells which had declined to stripper stages thereby increasing their recoverable reserves and lowering their abandonment pressures. It has lengthened the period of the field's peak deliverability by approximately 10 years. Well stimulation has permitted the clean-up and maintenance of deteriorating wells. It has afforded many operators the only opportunity to improve their competitive position in the field. Well stimulation should be encouraged rather than discouraged. Retention of the present deliverability formula will provide the economic incentive to properly maintain and improve wells. Adoption of the reserve index proposals would lessen this incentive because in determining allowables less effect is given to improved producing capabilities. Because well stimulation permits the recovery of gas which otherwise would be left in the ground and permits the operators of wells in unfavorable positions to improve their competitive positions, the deliverability formula protects correlative rights and prevents waste in accordance with the mandate of the Kansas statutes.

"3. The deliverability formula has governed the allocation of gas allowables to the individual wells in the field more than the past 20 years. This experience permits all persons concerned to make reasonable projections upon which future plans can be made. The reserve index proposals have never been used to prorate gas. There is no experience from which to judge the merits of the proposal. Under the circumstances, we would not be justified in abandoning the adjusted deliverability formula which experience has shown has adequately protected correlative rights and prevented waste.

"4. The reserve index allowable projections submitted by the proponents were not worked in accordance with their proposals. For this reason there is nothing in the record to indicate what would happen if the proposals were adopted. The applicant has not sustained its burden of proving that the proposed reserve index formula would adequately protect correlative rights and prevent waste as required by the Kansas statutes.

"5. Reserve index allowables are determined by use of pressure decline curves for individual wells. Many pressure decline curves require objective review of performance data and judgment in extrapolating the line-indicating slope. Such review and exercise of judgment should be performed by experienced personnel only. The IBM machines which make the calculations for the reserve index proposals cannot make the objective reviews and judgment interpretations required for determining allowables [sic] will lead to the violation of correlative rights and the adoption of the proposed reserve index formula would be unlawful.

"6. The deliverability formula gives full weight to current pressure measurement. This fact plus its 0.8 pressure control factor causes it to adjust rapidly to correct inequities and protect correlative rights. The reserve index proposals would lessen the effect of current pressures by use of 7 or 10 pressure points. The pressure correction factors as proposed (0.6 and 0.4) would equalize pressure differences between offsetting wells more slowly. In a large field with many purchasers, the adjusted characteristics are very necessary for the protection of correlative rights and prevention of waste. The retention of the adjusted deliverability formula will permit the Commission to carry out its statutory obligations in this respect.

"7. Through the minimum allowable provision, the present basic proration order has assured all wells of an allowable large enough to permit economic operation. The adjusted deliverability formula gives all the other wells the opportunity to ultimately recover the reserves underlying their attributed acreage and to currently produce proportionately with the other wells in the field without cognizable uncompensated drainage over any reasonable period of time. The reserve index proposals would not afford the wells in the field such an opportunity.

"8. The application to change the proration formula for the Kansas Hugoton Field should be denied.

The district court's order upon review, made orally from the bench, was:

"Let the record show that at the conclusion of all the arguments of counsel the Court is ready to decide the matter. It is the decision of the Court, within the limited jurisdiction the Court has in this matter, that here is evidence to sustain the action of the Commission and the Court makes a general finding that their action is supported by evidence and that their conclusions drawn from the evidence are legal, and their acts are not arbitrary, capricious or illegal. Therefore, the Commission's order will be sustained, but, while this Court does not have power to order this case remanded and there is evidence to sustain the Commission's order, I think the Court perhaps is in a position to criticize that order.

"It seems rather clear to me from this evidence that the deliverability formula when faced with the stress of fracturing and refracturing, together with the complications that arise from overages and underages in the taking of gas, is not working properly to carry out the mandates of the statute. I think that the Commission's own findings indicate that there is inequity in the field, that gas is being taken for which there is no just recompense to the persons who are suffering from the drainage involved. It would be the Court's recommendation, but not an order, that the Commission, through its own staff, should investigate as to whether or not this deliverability formula should be revised and altered. Now in the proceedings in front of the Commission the Commission never got a fair shot at this point because all it was that was in front of the Commission was the desirability on one side of reserve index formula and of the present formula, and everybody spent a lot of time, a lot of money, and had experts figuring out how they would be affected. The record is practically devoid of impartial testimony as to

what was the fair way to do it. All the experts testified what helped their company, and I mean the Commission didn't have a fair set of expert testimony in front of it as to what would be a fair order and what is the correct order. All they had was comparison of one system against another, and for what its worth, since I cannot substitute my judgment for that of the Commission, I am affirming their order, but I am suggesting to them they should re-examine the matter upon their own."

Appellees make much of the prehearing conference order, limiting the hearing to evidence necessary to support or rebut any proposed proration formula. They argue the hearing was not a general investigation into the advisability of revising the deliverability formula but was only to determine if appellant's proposed reserve index formula should be adopted. They make this argument in response to appellant's present position that the whole proceeding should be remanded to the commission with instructions to adopt a formula more nearly in compliance with the mandate of K. S. A. 55-703. The hearing may have become broader than prescribed in the prehearing order. Comparison between the two formulas was inevitable. Rejection of the one proposed left the other standing, although we know of no reason why the commission, after full hearing, could not have made changes it considered warranted. We are not inclined to quibble over the approach taken. Upon review the basic question remains, was the commission's order lawful and reasonable?

Appellant presents twelve specifications of error directed at the action taken both by the commission and the trial court. Some are based directly upon the findings and conclusions made by the commission and sustained by the trial court, and the remainder stem from the trial court's remarks made after it sustained the commission's order. The first group of alleged errors is embraced in a determination of the question whether the commission's order was lawful and reasonable, that being the scope of judicial review (*Colorado Interstate Gas Co. v. State Corporation Comm.*, supra).

The corporation commission is charged with the duty of regulating the production and conservation of natural gas within the state under certain conditions (K. S. A. Chap. 55, Art. 7).

K. S. A. 55-703 prescribes part of that duty:

". . . any person, firm or corporation having the right to produce natural gas therefrom, may produce only such portion of all the natural gas that may be currently produced without waste and to satisfy the market demands, as will permit each developed lease to ultimately produce approxi-

mately the amount of gas underlying such developed lease and currently produce proportionately with other developed leases in said common source of supply without uncompensated cognizable drainage between separately-owned, developed leases or parts thereof.

"The commission shall so regulate the taking of natural gas from any and all such common sources of supply within this state as to prevent the inequitable or unfair taking from such common source of supply by any person, firm or corporation and to prevent unreasonable discrimination in favor of any one common source of supply as against another and in favor of or against any producer in any such common source of supply. In promulgating rules, regulations and formulas, to attain such results the commission shall give equitable consideration to acreage, pressure, open flow, porosity, permeability and thickness of pay, and such other factors, conditions and circumstances as may exist in the common source of supply under consideration at the time, as may be pertinent. . . ."

### In *Colorado Interstate* we said:

"The Commission has three responsibilities under the Gas Conservation Statute. It must first of all prevent waste of the natural resource. It must allow sufficient production to meet the market demand if such can be done without waste. It must protect correlative rights.

"In a gas field such as the Kansas-Hugoton where five major companies are taking gas through separate pipelines not connected to the same wells, the responsibilities placed upon the Commission will clash. If the market demand cannot be supplied without waste, or if correlative rights cannot be protected without waste, or if correlative rights cannot be protected without unduly restricting production needed for the market demand, one of the three, waste, market demand, or correlative rights, must suffer. The dominant purpose of the Gas Conservation Statute is to prevent waste. (*Kansas-Nebraska Natural Gas Co. v. State Corporation Commission,* 169 Kan. 722, 222 P. 2d 704.)

"The Commission cannot require or guarantee that each well owner will produce and sell his entire allowable. The Commission is required to afford each owner the 'right or opportunity' to produce his share. As far as the Commission's duty under the basic order goes, it is fulfilled when each owner is legally 'free to produce' and not denied the 'right or opportunity' to produce his allowable.

"The Commission could not be required to shut in an entire gas field to protect correlative rights where some of the producers desired to cease production and hold a gas field for a reserve. The Commission could not be required to unduly restrict production in a gas field because some producers desired to deplete the gas at a very low rate regardless of the reason.

"When waste, market demand, and correlative rights are in conflict the Commission must determine which is to be given preference. If the decision of the Commission is supported by evidence, the courts cannot interfere." (pp. 24-25.)

Thus the question is whether the trial court properly determined there was evidence to support the commission's order. The trial

court had before it a 1,700 page transcript of the proceedings before the commission. Included were the testimony of fifteen expert witnesses and numerous exhibits. Abstracted for us, the record containing the evidence is proportionately voluminous. Some of the evidence is conflicting and subject to different interpretation because of its highly technical nature. We will discuss it only briefly.

Apparently the advent of heavy fracturing in the field precipitated the dispute. The process commenced in the middle 1950's. Appellant argues a fracturing race eventually developed among the various producers, which was unnecessary, costly and uneconomical. By the end of 1964 there were 1,811 fractured wells, of which 1,569 were fractured during 1962, 1963 and 1964. Appellant contends the emphasis placed on deliverability in the present formula has contributed to this situation, resulting in an imbalance in the field with uncompensated drainage. The record contains much testimony as to the different situations in which fracturing has occurred, e. g., to repair well bore damage, to regain position in older wells to compete with newer wells drilled under modern techniques permitting more efficient primary recovery, fracturing with different rates of materials and pressures used, and some refracturing. Apparently the peak has been reached. The subject was fully explored in the hearings and we think the commission's findings dealt with it fairly. The commission can do nothing to change the natural excellence of any particular tract in the field; it can only provide each a fair opportunity to produce its share.

The differences in the two formulas under consideration were obvious. Among others, that of the commission emphasized the individual well's ability to produce, and recoverable reserves; appellant's emphasized gas in the ground, which might not be recoverable inasmuch as its reserve estimate was projected down to zero pounds pressure. The former used stronger pressure controls (80%) to correct imbalance than did the latter (either 40 or 60%). Appellant's formula would also be less quickly responsive to pressure changes because based on either the last five, seven or even ten pressure tests on the well, instead of the most recent. The importance of this is seen in the fact that whenever a well produces a greater share of its recoverable reserves than its neighbors, its pressure will decline more sharply than does the field average; whenever a well's pressure declines more than the field average,

its subsequent deliverability and allowable will be correspondingly reduced.

Three of the producers who appeared at the hearing supported appellant's proposed formula. One gave its approval with some modification based upon the studies made by appellant, one approved but wanted substantial changes (for example, 40% control factor), and one apparently approved without reservation. Concededly, considering the complexities involved, no formula is perfect, and none is capable of keeping the field in exact balance as some drainage constantly occurs. The high pressure control feature of the commission's formula is designed to act rapidly to minimize pressure differences and prevent ultimate cognizable, uncompensated drainage. Lower allowables would, of course, result under appellant's formula. Several of the briefs filed by appellees point out numerous serious deficiencies in it, particularly as compared with the present one. Not all these flaws are mentioned in the commission's evidentiary findings; however, they are in the evidence and lend support to the commission's ultimate findings and conclusions. The commission did point out that as of November, 1965, the field's major pipeline company, Cities Service Gas Company, had huge accumulated underproduction as compared to all other companies (finding No. 11). This finding recognizes that problems of drainage are contributed to when a major purchaser fails to use the field adequately as a source of supply. Problems caused by such underages are best and most quickly solved by the deliverability formula, and the formula appears in fact to be working rapidly to minimize any imbalance created. The record contains evidence the deliverability formula was not the cause of any current problems in the field. If appellant's problems are caused by the fracturing in the field, the record contains evidence the proposed reserve index formula would not alleviate the condition.

In all its arguments appellant has stressed that the present formula has failed to allow its wells to "currently produce proportionately with other developed leases in said common source of supply" (K. S. A. 55-703) but it fails to include the qualification which follows in the statute, i. e., "without uncompensated cognizable drainage between separately-owned, developed leases or parts thereof. . . ." As indicated, drainage is inevitable in an active field such as the Hugoton. The deliverability formula contemplates counter drainage and thus provides compensated drainage in a

subsequent period of time, recognizing the impossibility of applying the literal meaning of the word *currently*. The formula does appear to provide each individual well fair opportunity to recover its share of the field recoverable reserves. We understand that, under the basic order, at the request of industry, nonfractured wells are tested only in alternate years and fractured wells but once a year for three years immediately after the fracture. More frequent testing would, of course, result in more rapid equalization, but this would be accompanied by greater hardship because of the longer shut-in. In any event, the testing provisions of the basic order were never an issue in the proceeding.

In *Colorado Interstate* we recognized the commission is required to afford each owner the fair opportunity to produce his share. In it we also said:

> "It may be stated as a general proposition of law that the determination of market demand and establishing allowables is a responsibility which the legislature has lodged in the Commission. The courts are without jurisdiction to determine the method the Commission should use or the factors which it should consider. The courts may examine the methods used for the purpose of determining whether the Commission has acted within the power and authority delegated to it by the legislature.
>
> "In considering the validity of the Commission's determination, the courts can consider only the statutes granting the Commission's authority and the Commission's basic order with such amendments as are properly made thereto. The determination is a question of fact. What facts are to be considered and the relative weight to be accorded them are matters left to the Commission's discretion. Unless the determination is arbitrarily or capriciously made without supporting evidence, the courts cannot interfere and substitute their judgment for that of the Commission. The question for the reviewing court is the power of the Commission to make the order, not its wisdom, propriety or expediency in having made it." (p. 18.)

The commission's order is substantially supported by evidence. The commission has taken into account the various factors it is required to consider under 55-703 and we think its order represents a reasonable and practical effort to handle a difficult problem in compliance with the legislative mandate.

Appellant vigorously asserts the trial court misconceived its function and that it sustained the commission's order principally on the ground of lack of jurisdiction to do otherwise. Appellant contends the court should have remanded the matter to the commission for further proceedings in the light of that which the court had to say.

We cannot agree. We think the trial court clearly recognized, and acted within, the proper scope of its review. Once the trial court sustained the commission's order, it had no power to remand the proceeding, and correctly so stated. Having said this, it made that which it termed recommendations, but specifically not an order. The court was primarily concerned with the partiality of the witnesses before the commission, of which the commission was doubtless cognizant, and hopefully opted for something better. Moreover, the prehearing order, good or bad, limited the scope of the hearing to evidence on a proposed formula, that order was never challenged, and the scope of the proceeding could not in any event be expanded. If the trial court's informal remarks could be construed to indicate unreasonable or unlawful action on the part of the commission its express formal holding was to the contrary and must control.

In reaching our conclusion of affirmance we have not overlooked the many contentions industriously and capably advanced by appellant.

The judgment is affirmed.

APPROVED BY THE COURT.