No. 56,917

NORTHWEST CENTRAL PIPELINE CORPORATION; KN ENERGY, INC.; AMOCO PRODUCTION COMPANY; and COLORADO INTERSTATE GAS COMPANY, *Appellants,* v. THE STATE CORPORATION COMMISSION OF THE STATE OF KANSAS, MICHAEL LENNEN, Chairman, RICHARD D. (Pete) LOUX, Commissioner, PHILLIP R. DICK, Commissioner, and their respective successors in office, *Appellees.*

(699 P.2d 1002)

Opinion filed May 10, 1985.

Mark H. Adams, II, of Adams, Jones, Robinson & Malone, of Wichita, argued the cause, and Teresa J. James, of the same firm, and Bill Sears and John H. Cary, of Tulsa, Oklahoma, were with him on the briefs for appellant Northwest Central Pipeline Corporation.

Ralph R. Brock, of Morris, Laing, Evans, Brock & Kennedy, Chartered, of Wichita, argued the cause, and Robert W. Coykendall, of the same firm, was with him on the brief for appellants Cabot Petroleum Corporation, Northern Pump Company, Graham-Michaelis Corporation, and Kansas Petroleum, Inc.

Timothy E. McKee, of Martin, Pringle, Oliver, Triplett & Wallace, of Wichita, argued the cause, and William M. Lange and Kim R. Cocklin, of Colorado Springs, Colorado, and Robert A. Miller, Jr., of Lakewood, Colorado, were with him on the brief for appellants Colorado Interstate Gas Company and KN Energy, Inc.

Glenn D. Young, Jr., of Gott, Young & Bogle, P.A., of Wichita, argued the cause, and Victor S. Nelson, of the same firm, was with him on the brief for appellant Amoco Production Company.

Charles H. Apt III, of Glaves, Weil, Evans & Hoke, of Wichita, argued the cause, and Jack Glaves, of the same firm, and William Robertson, of Kansas City, Missouri, were with him on the brief for appellee Panhandle Eastern Pipe Line Company.

Jeff Kennedy, assistant general counsel, argued the cause, and Brian J. Moline, general counsel, was with him on the brief for appellee Kansas Corporation Commission.

Richard C. Byrd, of Anderson, Byrd & Richeson, of Ottawa, argued the cause, and Steven C. James, of Amarillo, Texas, was with him on the brief for intervenor-appellee Mesa Petroleum Company.

The opinion of the court was delivered by

HERD, J.: This is an appeal from an order affirming a Kansas Corporation Commission (KCC) order amending paragraph (p) of the basic proration order for the Kansas Hugoton Gas Field.

Cabot Petroleum Corporation, Northern Pump Company, Graham-Michaelis Corporation, and Kansas Petroleum Inc., are independent producers of natural gas from the Kansas Hugoton Field and operate a total of 189 wells connected to various pipeline systems in the field. Colorado Interstate Gas Company and KN Energy, Inc. (KN) are interstate pipeline companies engaged in the transportation and sale for resale of natural gas in interstate commerce. KN is also engaged in the production of natural gas from the Hugoton Field and operates numerous wells which produce gas from that field. Northwest Central Pipeline Corporation (successor to Cities Service) is a pipeline company also operating in the Hugoton Field. Amoco Production Company is also a lessee-producer of natural gas in the Hugoton Field. Each of these companies appeared before the KCC to contest the amendment to the basic order, and are appellants here. Panhandle Eastern Pipe Line Co. is an interstate pipeline which purchases gas from Hugoton wells. Panhandle participated in the hearings before the KCC and supported the KCC's position. Panhandle intervened in the appeal before the district court. Mesa Petroleum Company is a producer in the Hugoton Field. Mesa was a party to the proceedings before the KCC and supports the amended order.

The Kansas Hugoton Field is approximately one hundred sixty miles long and forty to seventy-two miles wide. It covers all or major portions of nine Kansas counties and minor portions of two additional counties. The over 4,000 gas wells in the field are connected to pipeline systems of seven major producers and several smaller purchasers.

The basic proration order for the Hugoton Field was adopted on March 21, 1944. The purpose of the order is to prorate the demand for gas, as determined twice a year by the commission, among all the wells in the Hugoton Field. The proration is made by assigning an allowable to each well. From its inception the basic proration order has assigned the allowables on the basis of the relative abilities of the wells to produce gas pursuant to a deliverability formula. The formula balances various factors in an effort to regulate production so that the amount produced over

time from any well is equal to the amount of gas originally in the developed lease.

Some adjustments in allowables resulting from the deliverability formula are caused by pressure differentials in the various gas wells. Gas flows from high pressure areas to low pressure areas. A well's pressure falls when it is produced. When a well is underproduced in relation to its allowable, and relative to the other wells which are producing their allowables, its pressure becomes higher. If this condition is permitted to continue over a period of time, drainage occurs from the underproduced well with the higher pressure to the low pressure area of the overproduced wells. As pressure is a major component in determining adjusted deliverability, the pressure differences result in a higher adjusted deliverability for the underproduced wells with a resulting increase in the current allowable. When the larger allowable and underage is produced, the well's pressure drops below the other wells and compensating drainage occurs. After the pressure drop the adjusted deliverability for the well is decreased with a resulting decrease in its allowable. This is the technique utilized in the attempt to keep the wells in balance in the long pull.

Divergent rates of "takes," as a result of varying market conditions experienced by the purchasers in the field, cause unplanned pressure differences among the producing wells. Every purchaser, because of varying market demands, has gone through cyclical periods of overproduction followed by periods of underproduction causing underages. The different purchasers are not in the same phase of the cycle at the same time. As a result, drainage among the developed leases is constantly taking place. Prior commission practice developed a system designed to ensure that counter or compensating drainage would occur.

The history of the field shows the turnaround in the marketing conditions of the various purchasers from periods of low demand to periods of high demand often takes many years. For example, Amoco's wells, 97% of which are connected to Northwest Central Pipeline, were underproduced in the late 1960's and early 1970's and suffered great volumes of cancelled underage. From May, 1972, through 1981, 66,707,113 million cubic feet (MCF) of cancelled underage were reinstated, of which 60,650,544 MCF were produced. Now, however, due to high allowables assigned by the commission and soft market demand, these wells have

suffered approximately 73.7 billion cubic feet (BCF) of cancelled underage and the volumes of cancellation are increasing monthly. Cabot, whose wells are also connected to Northwest Central, experienced this same cycle. Cabot suffered essentially no cancelled underage prior to 1967, but during the next six-years had 1,390,905 MCF cancelled, followed by a six-year period in which 1,158,808 MCF were reinstated, of which approximately 87% was produced. During the last three-and-a-half years Cabot again has suffered large volumes of cancelled underage. KN Energy was overproduced in the late 1960's and early 1970's, but became underproduced from approximately 1971 through 1977. It has been making up underage since 1978. It predicts it will take nine years to make up all of its underage. The Mesa wells, which are now 2.6 BCF overproduced, were underproduced in 1953 and incurred cancellation of underage with no reinstatement until 1964.

As of September 1, 1982, the entire Kansas Hugoton Field had an underage of 204.5 BCF as compared to 144.5 BCF underage September 1, 1981. According to KCC records, there have been 508 BCF of underages cancelled in the Kansas Hugoton Field from January 1, 1967 to August 1, 1982. 194 BCF of those underages were reinstated. It is significant to note that all appellants here are in an underproduced status currently, while Mesa and Panhandle are both in an overproduced status. History indicates market changes sufficient to make up underages have taken six to ten years.

Since it was first issued, various provisions of the basic order, including paragraph (p), have been amended whenever the KCC determined any such provision was not adequately achieving the purpose of the order.

Because of the volume of underproduction, in March, 1982, the KCC began a general investigation into the provisions of the basic proration order to determine whether there was a need for revision. Hearings were held where it was determined some producers had accumulated excessively high underage in the Hugoton Field. As a result of the hearings, the commission issued its order on February 16, 1983, which amended paragraph (p) of the basic order for the avowed purpose of reducing underages.

Prior to this amendment to paragraph (p), the order permitted any well with an adjusted deliverability in excess of 300 MCF to

accumulate underproduction equal to six times the amount of the current allowable assigned to the well for the preceding January. Any amount in excess of this formula was cancelled. The cancelled underage would then be reinstated if the producer could show the well was in an overproduced status and that purchasers were willing and able to take the gas within a reasonable time.

The amendments to paragraph (p) in dispute here divide the cancelled underage in the field into three categories: (1) underage cancelled prior to January 1, 1975; (2) underage cancelled between January 1, 1975, and December 31, 1982; and (3) underage cancelled after December 31, 1982. For each of these categories of underage the commission established requirements to be met by producers seeking to have such underage reinstated. For the pre-1975 cancelled underage, a producer was required to make application for reinstatement with the commission on or before December 31, 1983. For 1975 to 1982 cancelled underage, reinstatement must be requested by December 31, 1985. For underage cancelled after December 31, 1982, the producer has three years from the date of cancellation to apply for reinstatement. For any producer to request reinstatement of underage cancelled after 1974, the affected well must be in an overproduced status. Any underage not reinstated, or if reinstated not produced at the end of the allotted time period, will be cancelled permanently. A producer has sixty months in which to produce the reinstated underage.

After rehearing by the KCC in which the commission's order was affirmed, the case was appealed to the district court. The district court affirmed the commission's order.

Prior to separate discussion of the issues it is important to remember the scope of appellate review of KCC orders. We recently set out the rules in *Oilfield Fluid Motor Carriers v. Kansas Corporation Comm'n*, 234 Kan. 983, 677 P.2d 982 (1984), where we stated:

" 'K.S.A. 1978 Supp. 66-118d limits judicial review of an order by the commission to determining whether the order is "lawful" or "reasonable." *Kansas Gas & Electric Co. v. State Corporation Commission*, 218 Kan. 670, Syl. ¶ 1, 544 P.2d 1396 (1976). A court has no power to set aside such an order unless it finds that the commission acted unlawfully or unreasonably. *Jones v. Kansas Gas and Electric Co.*, 222 Kan. 390, 396-7, 565 P.2d 597 (1977). An order is "lawful" if it is within the statutory authority of the commission, and if the prescribed statutory and procedural rules are followed in making the order. *Central Kansas Power*

*Co. v. State Corporation Commission,* 221 Kan. 505, Syl. ¶ 1, 561 P.2d 779 (1977). An order is generally considered "reasonable" if it is based on substantial competent evidence. *Jones v. Kansas Gas and Electric Co.,* 222 Kan. 390, Syl. ¶ 2.

" 'The legislature has vested the commission with wide discretion and its findings have a presumption of validity on review. *Central Kansas Power Co. v. State Corporation Commission,* 221 Kan. at 511. Since discretionary authority has been delegated to the commission, not to the courts, the power of review does not give the courts authority to substitute their judgment for that of the commission. *Central Kansas Power Co. v. State Corporation Commission,* 206 Kan. 670, 675, 482 P.2d 1 (1971). The commission's decisions involve the difficult problems of policy, accounting, economics and other special knowledge that go into fixing utility rates. It is aided by a staff of assistants with experience as statisticians, accountants and engineers, while courts have no comparable facilities for making the necessary determinations. *Southwestern Bell Tel. Co. v. State Corporation Commission,* 192 Kan. 39, 48-9, 386 P.2d 515 (1963).' " 234 Kan. at 986, quoting *Midwest Gas Users Ass'n v. Kansas Corporation Commission,* 3 Kan. App. 2d 376, 595 P.2d 735, *rev denied* 226 Kan. 792 (1979).

The first issue raised in this appeal is whether the order of the KCC is in violation of K.S.A. 55-703.

The KCC is vested with the responsibility to protect correlative rights of producers and landowners when production is from a common source of supply. K.S.A. 55-703 provides that whenever the available production of natural gas exceeds the market demand, then,

"any person, firm or corporation having the right to produce natural gas from the common source of supply may produce only that portion of all the natural gas that may be currently produced without waste and to satisfy the market demands, as will permit each developed lease to ultimately produce approximately the amount of gas underlying the developed lease and currently produce proportionately with other developed leases in the common source of supply without uncompensated cognizable drainage between separately-owned, developed leases or parts thereof.

"The commission shall regulate the taking of natural gas from any and all common sources of supply within this state in order to prevent the inequitable or unfair taking of natural gas from a common source of supply . . . "

Thus, the KCC's duty under K.S.A. 55-703 is to prevent waste and protect correlative rights. Appellants argue that in order to issue its current order, the KCC redefined correlative rights. "Correlative rights" has been defined by the KCC in the past as follows:

" 'Correlative rights' means that each owner or producer in a common source of supply is privileged to produce from that supply only in a manner or amount that will not injure the reservoir to the detriment of others, take an undue proportion of the obtainable oil or gas, or cause undue drainage between developed leases." K.A.R. 82-3-101(15).

The KCC argues it has not redefined "correlative rights," but that in addition to the definition contained in K.A.R. 82-3-101(15), the KCC must also apply the statutory provisions which further define correlative rights as those which only exist "currently." For support the KCC cites K.S.A. 55-703, which states individuals have the right to produce gas from the common source of supply "that may be *currently* produced" and they may "*currently* produce proportionately with other developed leases in the common source of supply." Appellants argue the KCC's position that it may define correlative rights as that which can be *currently* produced, effectively eliminates their right to regain, through long-term recovery of underages, their fair share of the gas in the Hugoton area.

Appellants also argue that the KCC's reliance on the language in K.S.A. 55-703, which includes the word "currently," misconstrues the statute, since it fails to take into consideration the qualifying phrase which follows in the statute. That phrase is "without uncompensated cognizable drainage between separately-owned, developed leases or parts thereof." Thus, the word "currently" allegedly is not allowed to be singled out when there are significant drainage problems. For support appellants cite *Cities Service Oil Co. v. State Corporation Commission*, 205 Kan. 655, 668-69, 472 P.2d 257 (1970), where it was held:

"As indicated, drainage is inevitable in an active field such as the Hugoton. The deliverability formula contemplates counter drainage and thus provides compensated drainage in a subsequent period of time, recognizing the impossibility of applying the literal meaning of the word currently."

Appellants also cite the language of K.S.A. 55-703 which states correlative rights are to be determined according to what each lease will "ultimately produce." Appellants argue that if their underages are permanently cancelled here they will not be able to receive counter drainage and thus *ultimately* they will not receive a proper share of the common source of supply.

In support of its order, the KCC cites *Republic Natural Gas Co. v. State Corporation Commission*, 173 Kan. 172, 244 P.2d 1196 (1952), which discusses the application of the term "currently" in 55-703. In that case an order of the KCC denying reinstatement of a cancelled underage was appealed. The appellants in that case argued if their underage in the Hugoton

Field was permanently cancelled, their correlative rights would be violated. In affirming the KCC we stated: "This argument fails to take into consideration the time element in proration." 172 Kan. at 179. The court noted paragraph (p) was placed in the basic order by the KCC because of the difficulty involved in causing a well to produce exactly its allowable each month. Based upon this rationale, the court held the correlative rights which the KCC must protect pursuant to 55-703 include the portion of all the natural gas that may be *currently* produced, without waste and to satisfy the market demands. 173 Kan. at 180.

Appellants here argue *Republic* is clearly distinguishable from the instant case. In *Republic,* the KCC was engaged in *limiting* production in order to protect correlative rights. Here, appellants allege the commission inappropriately utilizes the language of *Republic* to support its attempts to induce greater production by giving the market incentives and thus create greater demand.

Appellants also argue the KCC has unlawfully delegated to the purchasers its authority to protect the correlative rights. The reasoning here is since gas cannot be stored but can only be produced when there is a purchaser, under the amendment to paragraph (p) it is up to the purchasers to take enough gas from the producers with significant underages to prevent the cancellation of those underages.

After careful consideration, we are led to the conclusion the KCC's new definition of correlative rights is incorrect. It ignores both K.S.A. 55-703 and K.A.R. 82-3-101(15). There the emphasis is on preventing the inequitable and unjust taking of natural gas from a common source of supply with the objective of providing a way for each developed lease to ultimately produce the gas underlying it. The statutory reference to "currently produce" must be interpreted with the rest of the sentence. It is then apparent the legislature ordered current production to be proportionate with other leases in the pool, without drainage, to attain equity.

That, however, does not resolve this issue. The KCC order amending paragraph (p) of its basic Hugoton Field proration order does not necessarily conform to its own new definition of correlative rights with the emphasis on current production. The amended order provides each producer an opportunity to rein-

state its cancelled underages and thus the right to ultimately recover the gas under its leases. As argued by the KCC, such an opportunity is all the KCC can provide as it is impossible to force current equal production from all wells in the common source of supply.

Some of the appellants also argue that the problem was caused by the KCC because it ignored the current market demand and set the allowables too high. Allowables have been set many times above the market demand. While this is true, the allowables were not appealed and are thus not at issue in this case. The issue is whether the order violates the provisions of K.S.A. 55-703.

Appellants next contend there is substantial evidence the KCC acted beyond its authority as established in K.S.A. 55-703, when it failed to prevent waste and ensure equitable taking, but instead amended paragraph (p) to increase production in the Hugoton Field. We have held the KCC's authority is limited to that conferred by statute. *Bennett v. Corporation Commission,* 157 Kan. 589, 596, 142 P.2d 810 (1943).

The testimony of Ron Cook, the sole KCC witness, supported by Michael S. Daugherty, Mesa's witness, Jimmy Mogg of Panhandle and Robert M. Danos of KN Energy, provides the evidence the KCC relied upon in making its amendment. See *Colorado Interstate Gas Co. v. State Corporation Commission,* 192 Kan. 1, Syl. ¶ 6, 386 P.2d 266 (1963), *cert denied* 379 U.S. 131 (1964). Cook testified the purpose of the amendment was to increase production. The order of February 16, 1983, also states the purpose of the order is to increase production. Appellants argue this purpose is beyond the KCC's authority. For support, appellants note there are no statutes which give the KCC authority to encourage production. Appellants also cite *Rush v. King Oil Co.,* 220 Kan. 616, 556 P.2d 431 (1976), to uphold their position. In *Rush,* the trial court ordered the drilling and development of a particular oil and gas lease. The trial court held the development was required in order for the lessee to comply with the implied covenants of reasonable development and protection against drainage. This court held the trial court's order was not invalidated by the KCC proration order establishing allowables for production, stating that the purpose of K.S.A. 55-601 *et seq.,* "is not to give the corporation commission the power to regulate

development but rather to prevent waste and the unfair or inequitable taking of oil from any pool." 220 Kan. at 627. Appellants urge that the power to regulate development is similar to the power to encourage production, and is thus not allowed under Kansas law pursuant to *Rush.*

Appellants also cite *Thompson v. Consolidated Gas Co.,* 300 U.S. 55, 81 L.Ed. 510, 57 S.Ct. 364 (1937), for authority that the encouragement of production is beyond the authority of the KCC. In *Thompson,* the authority of the Texas Railroad Commission was questioned under a Texas statute which allowed the commission the power to regulate natural gas activity in the state for the purpose of preventing waste and protecting correlative rights. The commission had issued an order establishing allowables in certain fields at very low levels in an attempt to encourage producers to take gas from other fields, not subject to the order, which were substantially underproduced. The order was challenged arguing it was coercive and its purpose and effect was not to prevent waste or protect correlative rights but to "compel" pipelines to take gas for which no market existed. The United States Supreme Court held the order was inconsistent with the purposes of the Texas gas conservation statute and the proration orders setting the low allowables were invalid as they bore no reasonable relation to the purposes of the statute. The court found there was no waste evident in the gas fields which were under the subject orders. Appellants here thereby conclude that since the purpose of the amendment is specifically to increase and encourage production in the Hugoton Field and not to prevent waste or to protect correlative rights, the order is beyond the KCC's authority and is thereby void.

Appellees argue it is within the KCC's authority to determine when field conditions and demand for natural gas necessitate a change in the basic order. Appellees cite *Colorado Interstate Gas Co. v. State Corporation Commission,* 192 Kan. at 25, for authority that:

"When waste, market demand, and correlative rights are in conflict the Commission must determine which is to be given preference. If the decision of the Commission is supported by evidence, the courts cannot interfere."

Appellees therefore argue it is completely within the commission's discretion to cancel the underages when it is determined

the underages have affected market demand. Furthermore, the appellees argue the commission is only required to

"afford each owner the 'right or opportunity' to produce his share. As far as the Commission's duty under the basic order goes, it is fulfilled when each owner is legally 'free to produce' and not denied the 'right or opportunity' to produce his allowable." 192 Kan. at 25.

Hence, appellees argue the KCC has provided the opportunity to produce, which is within its authority.

Appellants next argue the order of the KCC is arbitrary and capricious. It is well established in Kansas that an order of the state corporation commission will be set aside as arbitrary, capricious and unreasonable if it is not based upon substantial competent evidence. *Southern Kansas Stage Lines Co. v. Public Service Comm.,* 135 Kan. 657, 11 P.2d 985 (1932); *Colorado Interstate Gas Co. v. State Corporation Commission,* 192 Kan. at 14-15.

Appellants argue initially that the arbitrariness of the commission's disputed order can be determined from the fact that it is a change from its prior stand on the issue. For many years the commission followed a policy of ordering the reinstatement of cancelled underages when requested to do so if the purchaser was willing and able to take the gas. The orders reinstating cancelled underage were done "in protection of correlative rights and to permit said wells to produce their fair share of gas from under the field." The commission's current order, however, states that to protect correlative rights it must now *permanently* cancel underages which cannot be produced within the given time. This represents a change in the KCC's position. That, however, does not prove the KCC action was arbitrary, capricious or unreasonable. A regulatory body has authority to change positions on an issue if the new position is supported by substantial, competent evidence. *Warburton v. Warkentin,* 185 Kan. 468, 476-77, 345 P.2d 992 (1959). Here there was evidence the Hugoton Field required additional production to protect correlative rights. Commission action was thus prompted.

Appellants next argue even if the KCC has authority to promote production, the KCC has no idea whether its order will have that effect, and hence the action is arbitrary. For support, appellants cite the testimony of the KCC's witness, Cook, who testified at the hearing that he only hoped his plan would be an incentive to production. Since the actual production will be

dependent upon whether purchasers decide to purchase this new abundant amount of gas from the Hugoton Field and there is no way the KCC can compel the purchase, there is no way to know if the KCC's order will actually produce the effect it desires. Additionally, appellants argue the order will not have the KCC's desired effect of increasing production because purchasers will have to choose between taking under their take or pay contracts or taking from the Hugoton producers. Since it would be quite costly to take from Hugoton and make the payments required under the other contracts, appellants argue the pipelines will not increase their Hugoton takes. Hence, appellants argue the order is unreasonable.

Appellants finally argue that the order is arbitrary and capricious because it promotes waste and permanently affects the correlative rights of the parties. For support, appellants argue that many experts testified at trial that if the order is followed which requires production within this short amount of time the increased production with the change in pressure will result in water production by the gas wells. This movement of water into the gas field will also result in waste in that it will cut off gas in some parts of the field, thereby causing substantial waste. Appellants also point to the drainage and counter drainage over the history of the field. If the underages are permanently cancelled those that have experienced underages will never be able to regain their fair share of the gas since the amount they were allowed to take has been cut off by the KCC's order.

Panhandle Eastern argues the KCC's order is not arbitrary, citing *Republic Natural Gas Co. v. State Corporation Commission,* 173 Kan. 172, wherein we stated:

"There is nothing hard and fast, unreasonable or arbitrary about the cancellation of accumulated underages. . . .

"The entire matter, not of the cancellation, but of what effect the cancellation will have on future production of any well is a matter addressed to the judgment and discretion of the commission after a hearing." 173 Kan. at 181.

Appellants argue *Republic* is distinguishable from the instant case since it simply holds that cancellation will not result in violation of correlative rights so long as *actual* production is being spread among the wells in the field. Appellants contend this is not what the commission has been doing here. They contend instead of prorating actual production among the wells

in the field, the KCC has allegedly been spreading fictional market demands, which are far in excess of the ability of many of the interstate markets to absorb.

The KCC responds that many of the experts at the hearing testified that the Hugoton Field is not presently in balance and that correlative rights have been and are currently being violated due to the severe underage problem. Appellants argue, however, the KCC's order will not correct the problem. While the method of correcting a problem is generally within the KCC's sole discretion, unless it is arbitrary, capricious and ignores the evidence, then this court must hold the order improper.

Appellees contend it is within the discretionary authority of the commission to accept or reject any expert testimony presented. *Union Gas System, Inc. v. Kansas Corporation Commission,* 8 Kan. App. 2d 583, Syl. ¶ 1, 663 P.2d 304, *rev denied* 233 Kan. 1093 (1983). The facts to be considered and the weight to be accorded them are matters left to KCC discretion. See *Colorado Interstate Gas Co. v. State Corporation Comm.,* 192 Kan. 1, Syl. ¶ 6. The question, therefore, finally narrows to whether there was substantial competent evidence to support the KCC's order in this case.

The KCC through its expert, Ron Cook, whose testimony was corroborated by Michael S. Daugherty and Robert M. Danos, introduced evidence that the accumulation of underages in the Hugoton Field had rendered the field so out of balance it was seriously impairing the correlative rights of the landowners and operators. Cook testified:

"Correlative rights have been and are currently being violated by the uncompensated drainage that is occurring due to the unratable taking of allowables between offsetting leases. Future projections of gas production from the Hugoton Field indicate that this trend of accumulating more underage and cancelled underage will continue for a number of years.

"There is a definite possibility that near the end of many of the wells' productive lives, there will be a tremendous amount of cancelled underage that will never be reinstated due to the physical inability of the wells to make up such underage. This will result in a greater violation of correlative rights, because under the present provisions of Paragraph P of the basic order, there is no incentive to reinstate cancelled underage in a timely manner . . . ."

Cook's analysis and conclusions were seriously challenged by Lester Wilkonson, a petroleum engineer, whose testimony was adopted by all of the appellants. Mr. Wilkonson maintains the

amendment to paragraph (p) will have the opposite effect to that desired by the commission. He agrees that more production is needed from Hugoton Field but asserts it will not be obtained by the method chosen by the KCC. He further asserts that correlative rights of the owners and operators will be permanently damaged by the proposed cancellation of underages. He claims the schedule proposed for reinstating underages is tantamount to complete cancellation of them because with the weak market demand the pipelines cannot take enough additional gas from the producers to place them in an overage state. With regard to cancellation of underages, he testified:

"We have gone through periods when moratoriums were in effect and no underage was cancelled. Too, the flexibility limits of cancelling underproduction and overproduction have also been changed from time to time. As long as underage could be reinstated, no one had serious objection to the cancellation provisions. However, I personally have felt that cancellation of a portion of underage actually removed the 'heat' from the purchasers to take gas. In other words, if the public record reflects only a portion of the underage, the purchaser's takes do not appear to be too far out of line. In my opinion, if any change is to be made in the cancellation provisions of paragraph "p," it should be to place all underage, both present and cancelled, back on the report so we may take our heads out of the sand and see the true status of the individual wells connected to the various purchasers."

Michael S. Daugherty, a petroleum engineer for Mesa, had a different point of view:

"Mesa is aware of the recent reduction in the demand for natural gas industrywide. It is our opinion that this reduced demand is due both to conservation efforts of the consumers, largely brought about by the increase in price, and the present business recession in the national economy. We are aware of the reduced markets of the interstate purchasers. However, the evidence presented by the purchasers and the Commission staff in the recent Market Demand hearings indicates that the Hugoton Field has suffered a proportionately greater reduction in the takes than the other fields from which the purchasers are buying gas. In Mesa's opinion this is not fair to the Hugoton producers, the royalty owners, the taxing entities within the state or to Kansas consumers."

He went on to say that purchasers have reduced their Hugoton Field purchases

"due to the existence of take or pay contract provisions in the purchasers' contracts in other fields and the more restrictive tolerance provisions in the basic proration orders of the other fields. In my opinion, this makes it easier to use Hugoton for storage than the other fields from which the purchasers buy gas."

In response to a question about the benefits of Hugoton gas to Kansas consumers, Mr. Daugherty stated:

"[G]enerally speaking, the Hugoton Field gas is the cheapest gas available to the purchasers. Any reduction in the cost of gas due to increased runs from Hugoton is flowed through to the Kansas consumer."

### Daugherty continued:

"Mesa's intrastate purchaser, Kansas Power and Light Company, forecasts that approximately 37% (14 BCF of 38 BCF) of its main system gas for the winter period in 1982-83 will be obtained from Mesa out of the Hugoton and Council Grove Fields. This 14 BCF of gas is presently priced at approximately 67¢ per MCF. Low takes by other purchasers from the field and the resulting reduction in market demand from the Hugoton Field have necessitated KPL to seek additional short term supplies of gas. They have entered into a five (5) year contract with Cities Service Gas for approximately 8 BCF of gas per year. The November 1982 price of this gas will be in excess of $4.00 per MCF. The difference between the price of this gas and Hugoton 67¢/MCF gas from Mesa will be passed on to their Kansas customers."

### In response to questions, Daugherty then testified:

Q: What will KPL's cost be for this gas?

A: It appears that over the next five years KPL will purchase up to about 40 Bcf at over $4.00/Mcf at a total cost of about $160 million.

Q: How much would that amount of gas cost KPL if it were purchased from Mesa at 67¢/Mcf?

A: About $27 million.

Q: Will any of the gas sold to KPL by Cities Service Gas come from the Kansas Hugoton Field?

A: It is possible that some of it could come from the Kansas Hugoton Field, and to the extent that it does it will help to increase Cities Service's runs from the field. However, it should be pointed out that the producers and royalty owners will not share in the $4.00-plus price that KPL and its customers pay for this gas. Cities will be paying the producer an average of approximately 50¢/Mcf, the present NGPA Section 104 price, for whatever portion of the 8 Bcf of gas that is produced from Hugoton. The royalty owners and Kansas taxes are paid based on the 59¢/Mcf gas price. If the market demand, allowables and production in the field were at the level they have been in the past, 500 to 550 Bcf per year, KPL's customers could be receiving their requirements from Mesa at a much lower cost. To my knowledge, there is no gas being produced and sold by producers from the Hugoton Field that even approaches the $4.00-plus price that KPL is to pay Cities Service."

The testimony shows the KCC had evidence from experts who held different points of view. KCC chose to believe Cook and Daugherty. That is the KCC's prerogative. In *Colorado Interstate Gas Co. v. State Corporation Commission,* 192 Kan. 1, we stated:

"In considering the validity of the Commission's determination, the courts can consider only the statutes granting the Commission's authority and the Commission's basic order with such amendments as are properly made thereto. The determination is a question of fact. What facts are to be considered and the relative weight to be accorded them are matters left to the Commission's discretion. Unless the determination is arbitrarily or capriciously made without supporting evidence, the courts cannot interfere and substitute their judgment for that of the Commission. The question for the reviewing court is the power of the Commission to make the order, not its wisdom, propriety or expediency in having made it." 192 Kan. at 18.

The weight and logic of the evidence raises serious questions of the producers' ability to persuade the purchasers to take enough additional gas to acquire an overproduced state in time to avoid permanent cancellation of underages. However, there is substantial competent evidence in the record indicating otherwise under ideal circumstances. Thus, our doubts about the soundness of the KCC decision are not grounds for reversal. It is a matter of judgment and we are not permitted to substitute our judgment for that of the commission.

The KCC's dilemma is apparent. It was concerned about the dramatic decline in production from Hugoton and its effect on owners, producers and consumers. It sought ways to increase Hugoton production. It increased allowables in spite of reduced purchaser nominations and other evidence of less market demand. As a result, the disparity between overproducers and underproducers increased. It is arguable whether reduced production from the field was caused by a conscious choice of producers and purchasers to supply their demands from other sources and make Hugoton Field a storage facility or whether it was simply caused by reduced market demand. The KCC believed the former and amended paragraph (p) of the basic order to provide an incentive for production by permanently cancelling underages if not recovered on an accelerated schedule. Even though the testimony of Mr. Wilkonson was quite persuasive that the amendment would not have the desired effect of increasing production, but would instead result in a cancellation of all underages, we find there was substantial competent evidence to support the KCC's conclusion that correlative rights were being compromised by the excessive underages. This is the threshold issue which must be met before the KCC is authorized to make such orders as are necessary to correct the problem. While

selling gas is not a function of the KCC, except tangentially through setting allowables, nor is the providing of incentives for additional production a KCC function, when additional production is needed to protect correlative rights, the KCC has authority to create such incentives. K.S.A. 55-703 provides:

"The commission shall regulate the taking of natural gas from any and all common sources of supply within this state in order to prevent the inequitable or unfair taking of natural gas from a common source of supply by any person, firm or corporation and to prevent unreasonable discrimination in favor of any one common source of supply as against another and in favor of or against any producer in any common source of supply."

We conclude the KCC acted lawfully and reasonably in this case.

Appellants next argue the KCC order improperly interferes with federal regulation of natural gas in interstate commerce.

In *Northern Gas Co. v. Comm'n,* 372 U.S. 84, 9 L.Ed.2d 601, 83 S.Ct. 646 (1963), the United States Supreme Court struck down an order of the commission requiring Northern Natural Gas and other purchasers in the Hugoton Field to take ratably from the wells to which they were connected. The court reminded the commission that Congress enacted a comprehensive scheme of federal regulation of all wholesales of natural gas in interstate commerce, which leaves no room for direct or indirect regulation by the states that affects or may affect the ability of the federal power commission (now the Federal Energy Regulatory Commission [FERC]) to regulate completely and effectively the transportation and sale of natural gas in interstate commerce. The commission's ratable take order was invalidated under the following holding:

"Moreover, any readjustment of purchasing patterns which such orders might require of purchasers who previously took unratably could seriously impair the Federal Commission's authority to regulate the intricate relationship between the purchasers' cost structures and eventual cost to wholesale customers who sell to consumers in other States. This relationship is a matter with respect to which Congress has given the Federal Power Commission paramount and exclusive authority." 372 U.S. at 92.

Appellants argue, and the trial court agreed, that the effect of the KCC's order, if the purchasers decided to divert purchases from other fields to prevent the cancellation of their underages in Hugoton, would decrease production from other fields in other states. The district court specifically found the order would

induce increased production from the Hugoton Field and found that "[a]s a practical matter, the change in 'p' will . . . cause a change in the 'mix' of natural gas which pipelines transport for sale many miles away."

The district court found, however, that since the KCC order deals with producers of natural gas, rather than specifically ordering the purchasers to do anything, it falls within the specific exemption of the Natural Gas Act. This is consistent with the KCC's position that the obligations imposed by the order are on the producers, who are exempt from the federal act, not the purchasers.

Appellants argue the nature of gas automatically means the order controls the purchasers. Since gas may not be produced unless there is a purchaser, the order affects purchasers equally with the producers. Appellants note the testimony of Mr. Cook, the KCC's witness, who testified the purpose of the order was to effect production in the Hugoton Field. Appellants further note *Northern Gas*, which discusses the infringement by the states in the area of natural gas production and purchase:

"The Natural Gas Act precludes not merely *direct* regulation by the States of such contractual matters. . . .

"The federal regulatory scheme leaves no room either for direct state regulation of the prices of interstate wholesales of natural gas, [citation omitted] or for state regulations which would indirectly achieve the same result." 372 U.S. at 91.

Appellants also point out all that need be shown is an "imminent possibility of collision" between the KCC's order and the federal scheme of regulation. 372 U.S. at 92.

Appellees argue *Northern Gas* is distinguishable from the instant case. There the orders were "unmistakably and unambiguously directed at *purchasers* who take gas in Kansas for release after transportation in interstate commerce." 372 U.S. at 92. The United States Supreme Court noted that criminal sanctions for violations of the orders would fall, not upon the producers, but upon the pipeline purchaser. The order in the instant case gives us pause. It obviously is intended for purchasers, but is directed to producers. Hence, the question which this court must decide is whether this indirect effort to influence purchasers meets the standards noted in *Northern Gas*, which would preclude state regulation in this area. As stated in *Northern Gas*, federal regulation does not apply to the production or

gathering of natural gas. Interpreted in a narrow sense, as suggested by *Northern Gas,* the matter of allowables must be construed to pertain to production. The state has regulatory authority over production. The rules on underages are a part of production regulation and thus are not violative of the federal act, even though purchasers are indirectly caught in the backwash.

Appellants next argue the doctrine of equitable estoppel bars the enforcement of the KCC order amending paragraph (p). Appellants allege the KCC order has the effect of making it illegal to reinstate underage volumes which were previously allowed to accumulate legally. Appellants note the order does not operate prospectively by prohibiting the accumulation of future underage or reducing the extent of overproduction after which underage would be cancelled; rather, the order sets an "arbitrary" period of time for producers and purchasers to bring wells into an overproduced status, seek reinstatement of the cancelled underage, and produce the same. Appellants argue this is inconsistent with the doctrine of equitable estoppel. In *Bowen v. Westerhaus,* 224 Kan. 42, 46, 578 P.2d 1102 (1978), this court reviewed the law concerning equitable estoppel and held:

"Equitable estoppel is the effect of the voluntary conduct of a person whereby he is precluded, both at law and in equity, from asserting rights against another person relying on such conduct. A party asserting equitable estoppel must show that another party, by its acts, representations, admissions, or silence when it had a duty to speak induced it to believe certain facts existed. It must also show it rightfully relied and acted upon such belief and would now be prejudiced if the other party were permitted to deny the existence of such facts."

Appellees argue in response that estoppel against a government agency should not be invoked except in rare and unusual circumstances and may not be invoked where it would serve to defeat the effective operation of a policy adopted to protect the public. 31 C.J.S., Estoppel § 138. Appellants argue the order of the KCC in dispute here is not a policy adopted to protect the public or even to fulfill the duties of the KCC; rather, it is merely to induce an increase in production.

Appellees note there is no vested right to produce gas in the Hugoton Field. Further, the KCC must be given, and has been given, discretion to amend the basic order in the public interest when the evidence indicates that conditions in the Hugoton Field warrant a change. See *Colorado Interstate Gas Co. v. State*

*Corporation Comm.,* 192 Kan. 1, 28-29, 386 P.2d 266 (1963). Because authority has been granted to the KCC to modify the order when it deems necessary, appellants cannot reasonably rely on any prior orders of the KCC to such an extent as to invoke the doctrine of equitable estoppel. A regulatory body's orders are not a commitment and may be changed, reversed or amended if lawful and based on substantial competent evidence. This issue must fail.

Appellee Panhandle Eastern argues this appeal was improperly taken directly to the Supreme Court. Appellants, however, note this appeal was taken from the district court pursuant to K.S.A. 55-606. That statute provides that "[a]ppeals to the state supreme court may be taken from the judgment of the district court as in other civil actions." Panhandle Eastern argues civil actions may be taken directly to the state Supreme Court only "from a final judgment of a district court in any civil action in which a statute of this state or the United States has been held unconstitutional . . . ." K.S.A. 1984 Supp. 60-2101. Thus, appellee argues, since this case does not involve the constitutionality of a statute, this appeal was improperly brought to the Supreme Court instead of the Court of Appeals.

There are several statutes still lingering on the books which provide for a direct appeal to the Supreme Court under circumstances other than those noted in K.S.A. 1984 Supp. 60-2101. Among these are K.S.A. 55-606. Professor Gard in his comment to K.S.A. 60-2101 states:

"Note should be taken of any special statutes which provide for review of judicial or quasi judicial orders of certain administrative agencies by direct appeal to the supreme court. Such statutory provisions, until amended, should be considered as limitations on the court of appeals authority under this section." 2 Gard's Kan. C. Civ. Proc. 2d Annot. § 60-2101, p. 89 (1979).

Hence, since this statute has not been amended the legislature has clearly intended appeals under K.S.A. 55-606 to go directly to the Supreme Court. This argument is without merit.

Intervenor Mesa Petroleum Co. argues the pipelines do not have standing in this case. Mesa reasons that the rights of the mineral owners are commonly referred to as correlative rights. Those who possess correlative rights are the mineral interest owners. The Kansas Supreme Court has defined "mineral interest" to be:

" 'The term 'mineral interest' as commonly used refers to the oil and gas in place and constitutes a present ownership of an interest in real property. [Citation omitted.] A prime characteristic of a mineral interest is the right to enter the land to produce and carry on production activities. This right may be leased to others." *Stratmann v. Stratmann,* 204 Kan. 658, 662, 465 P.2d 938 (1970).

Since the pipeline purchasers have no mineral interest in the Hugoton Field, they have no correlative rights. Hence, Mesa argues they lack standing to appeal an order of the KCC relating solely to the prevention of waste and protection of correlative rights.

Appellants argue this issue was raised before the district court and denied. Appellees did not cross-appeal this issue, hence, the issue is not properly before this court. We have consistently held the right to an appeal is neither vested nor a constitutional right, but is strictly statutory in nature. See *In re K-Mart Corp.,* 232 Kan. 387, Syl. ¶ 2, 654 P.2d 470 (1982). Thus, since a cross-appeal was not taken this court will not consider this issue.

The judgment of the trial court is affirmed.

SCHROEDER, C.J., dissenting: As applied to this case, the KCC's duty under K.S.A. 55-703 is to *prevent waste and protect correlative rights* in the production of natural gas from the Hugoton Field, located in Kansas. The KCC is obligated by legislative mandate, where regulation is required, as here, to permit production of gas from the common source of supply of "only that portion of all the natural gas that may be currently produced without waste and *to satisfy the market demands,* as will permit each developed lease to ultimately produce approximately the amount of gas underlying the developed lease and currently produce proportionately with other developed leases in the common source of supply without uncompensated cognizable drainage between separately-owned, developed leases or parts thereof." K.S.A. 55-703. (Emphasis added.)

The pipeline companies that purchase natural gas in Kansas and other states for transportation in interstate commerce for resale have a right to purchase gas from their contracted dedicated reserves. Natural gas cannot be produced unless a purchaser is ready to buy it; it cannot be stored in a tank on the lease. *Northern Natural Gas Co. v. State Corporation Commission,* 188 Kan. 355, 360, 362 P.2d 599 (1961), *rev'd* 372 U.S. 84 (1963).

Thus it is the purchasers who supply the market to the field, which according to the basic order is supposed to be prorated among the wells in the field.

In this case the KCC continuously fixed allowables, for some time, far in excess of requirements to supply the demand for natural gas, which resulted in a huge underage of production in the Hugoton Field. This underage has been accruing since January 1, 1967. Since 1975 alone, the KCC has granted a 275 BCF allowable in excess of actual production.

In my opinion, the KCC has exceeded its statutory authority in fixing allowables far in excess of demand. This is clearly indicated by the huge underage existing in the Hugoton Field. This in turn has had its impact on drainage in the field illustrated by the fact that Mesa has no underage, but is in a state of over-production. The statutory obligation of KCC to protect correlative rights has, therefore, been ignored.

I would reverse and hold the KCC order amending the basic proration order by changing paragraph (p) to be invalid because it exceeds legislative authority. The fact that some expert may venture an opinion that this action is the solution to an existing problem in the field is wholly immaterial.

Even assuming arguendo that this infirmity is ignored, as the court in its opinion has done, the KCC has no jurisdiction to proceed on the theory it has adopted to amend the basic proration order. Federal preemption exercised through FERC's interstate regulatory authority nullifies the KCC order.

Many of the pipeline systems which transport natural gas from the Kansas Hugoton Field are integrated with pipeline systems connecting other gas fields, and natural gas from the Kansas field is thereby commingled with gas from other fields, including the Oklahoma and Texas portions of the Hugoton Gas Field. *Colorado Interstate Gas Co. v. State Corporation Comm.*, 192 Kan. 1, 5, 386 P.2d 266 (1963), *cert. denied* 379 U.S. 131 (1964). The connected reserves of the interstate purchasers in the field are a significant part of their total system-wide reserves. Any increase or decrease in the volumes of gas purchased within the state of Kansas changes the volumes of gas purchased outside the state (change in the "mix") and will change the average cost of gas to the purchasers. FERC's exclusive jurisdiction extends to the regulation of the intricate relationship between the purchasers'

cost structures and the eventual cost to distributors who sell to consumers in other states. *Northern Gas Co. v. Kansas Comm'n,* 372 U.S. 84, 9 L.Ed.2d 601, 83 S.Ct. 646 (1963).

Although the commission contends that its order is directed at producers not purchasers, its real purpose is to create an impact on purchasers' business decisions concerning the makeup of their interstate gas mix, with an eye toward making it economically prohibitive for such purchasers not to purchase increased substantial volumes of gas from the Kansas Hugoton Field even at the expense of their purchases from other states. The commission has not been correlating allowables with demand, ever seeking to compel purchasers to purchase more Kansas gas. Faced with mounting underages, increasing the imbalance in the field, the commission now attempts to use its ultimate weapon, the power to cancel forever the right to purchase connected reserves of a pipeline, insofar as it fails to purchase those volumes within the arbitrary period allotted by the commission.

This is clear from the commission's own findings. It found in the order that the correlative rights of a producer is the right to participate in a given market for a given period of time. (This does not compare with the definition of correlative rights in the commission's own Rule 82-3-101[15]). It found that the problem with correlative rights violation *does not result from the assignment of the allowables,* but rather from the failure of producers and pipelines to take production from the field. It found that its previous flexible reinstatement provision induced a lack of incentive to produce resulting in depriving some operators of the opportunity to participate in a given market, and that this resulted in discrimination. "It is the purpose of this Order not to restrict production of gas but to encourage it." Its interest was to provide sufficient incentive to "produce allowables," to encourage "production of current allowables," and create an incentive to produce "by tightening the provisions of the basic order with regard to the cancellation of underage."

Thus, the net purpose of the commission order is to require the production and purchase of the "assigned allowable" by making prohibitive the economic consequences facing the pipeline purchasers for not doing so, *viz.,* the permanent cancellation of their right to purchase from their connected reserves in the Kansas

Hugoton Field for which assigned allowables had previously been assigned.

The district court, looking at the same facts as were presented to the commission, specifically found that the order would induce increased production from the field, and found that "[a]s a practical matter, the change in '(p)' will . . . cause a change in the 'mix' of natural gas which pipelines transport for sale many miles away."

Thus, the district court made the basic finding of invalidity, but tried to avoid it by concluding that since the KCC order deals with the producers of natural gas, it falls within the specific exemption of the Natural Gas Act. This coincides with the commission's position that the obligations imposed to file applications for reinstatement are on the producers not the purchasers, and that the order deals solely with conservation matters.

But under the cloak of the "producing or gathering" exemption in the Natural Gas Act, under the pretense of promulgating a conservation regulation under reserved police powers, the Kansas Corporation Commission has in reality promulgated a regulation *the indirect result of which, and the precise purpose of which, is to invade and infringe upon the exclusive jurisdiction of FERC to regulate comprehensively and effectively the transportation and sale of natural gas, and to achieve the uniformity of regulation which was an objective of the Natural Gas Act. Northern Gas Co. v. Kansas Comm'n,* 372 U.S. 84.

The *Northern* case is a landmark decision. It arose out of "ratable take" orders by the Kansas Corporation Commission requiring a pipeline purchaser to purchase gas from a producer in no higher proportion to the allowables than from the wells of other producers. The U.S. Supreme Court held that the orders invaded the exclusive jurisdiction which the Natural Gas Act had conferred upon the Federal Power Commission over the sale and transportation of natural gas in interstate commerce for resale. The court specifically held:

"Moreover, any readjustment of purchasing patterns which such orders might require of purchasers who previously took unratably could seriously impair the Federal Commission's authority to regulate the intricate relationship between the purchasers' cost structures and eventual costs to wholesale customers who sell to consumers in other States. This relationship is a matter with respect to which Congress has given the Federal Power Commission paramount and exclusive authority. See *Federal Power Comm'n v. Hope Natural Gas Co.,* 320

U.S. 591, 610 [, 88 L.Ed. 333, 64 S.Ct. 281 (1944)]. The prospect of interference with the federal regulatory power in this area is made even more acute by the fact that criminal sanctions imposed by state statute for noncompliance fall upon such purchasers and not upon the local producers. Therefore, although collision between the state and federal regulation may not be an inevitable consequence, there lurks such imminent possibility of collision in orders purposely directed at interstate wholesale purchasers that the orders must be declared a nullity in order to assure the effectuation of the comprehensive federal regulation ordained by Congress." 372 U.S. at 92.

But the commission says that since this is a conservation matter reserved to the states under the production or gathering exemption (15 U.S.C. § 717[b][1982]), and because it is not directed to pipeline purchasers, but rather only to producers, *Northern* does not apply. The answers to these contentions are (a) this is not really a conservation matter because the only viable testimony in the record shows clearly that waste will be caused, not prevented, by the orders, and that correlative rights will be violated not protected by the order; (b) even if the foregoing were not true, and irrespective of whether there is a reasonable state purpose to be served by the order, it is invalid because the Natural Gas Act and FERC jurisdiction thereunder is comprehensive, and the Act's application from state to state will not depend upon kaleidoscopic variations in state law; (c) even if the order be not directed at purchasers, its indirect effect is to cause a modification in the interstate mix of gas on the Northwest Central System (as the district court found), and this is enough to tip it into constitutional invalidity.

First, the order will cause waste, not prevent it. "The dominant purpose of the Gas Conservation Statute is to prevent waste," *Colorado Interstate Gas Co.*, 192 Kan. at 25. But the undisputed testimony of Lester Wilkonson, the reputed expert on the Hugoton Field, is that the order may cause waste by inviting damaging water incursion as a result of a severe pressure drop, which might result in waste in the ground because of loss of communication with the gas reservoir.

Moreover, the commission practices of setting allowables in excess of the actual market demand have created rampant discrimination between the wells in the field. Thus, some wells, such as Mesa's wells connected to KP&L, with a higher proportionate intrastate market demand, have been permitted to produce a higher proportionate part of their reserves than the

majority of wells in the field connected to the interstate pipelines, such as Northwest Central and others, which have a plummeting market and no place to put the gas. The Mesa acreage adjoins that from which Northwest Central purchases. Therefore, the result of cancellation under this order will be to cement for all time that discrimination, and this will no longer permit the corrective or compensatory drainage which was the hallmark of the prior commission order for years. KP&L's intrastate customers will benefit, and Northwest Central interstate customers will be prejudiced. Compare *Penna. v. West Virginia,* 262 U.S. 553, 67 L.Ed. 1117, 43 S.Ct. 658 (1923), where the attempt to withdraw a large volume of gas from an established interstate commerce current so as to preferentially benefit local consumers in the state where the gas was produced was an unconstitutional interference with interstate commerce.

The commission tries to contend that there is a viable conservation purpose served by this order, but simply calling the order a conservation order does not make it one. The fact remains that the purpose of the order and its effect, indirect or otherwise, is to change the interstate gas mix by inducing more Kansas gas to be taken.

". . . 'Acts generally lawful may become unlawful when done to accomplish an unlawful end, *United States v. Reading Co.,* 226 U.S. 324, 357, and a constitutional power cannot be used by way of condition to attain an unconstitutional result.' *Western Union Telegraph Co. v. Foster,* 247 U.S. 105, 114." *Gomillion v. Lightfoot,* 364 U.S. 339, 347-48, 5 L.Ed.2d 110, 81 S.Ct. 125 (1960).

The Natural Gas Act is a comprehensive scheme of federal regulation of "all wholesales of natural gas in interstate commerce, whether by a pipeline company or not and whether occurring before, during, or after transmission by an interstate pipeline company." *Phillips Petroleum Co. v. Wisconsin,* 347 U.S. 672, 682, 98 L.Ed. 1035, 74 S.Ct. 794 (1954); *Northern Gas Co. v. Kansas Comm'n,* 372 U.S. at 91.

The Kansas Supreme Court has sustained the ratable take order, although recognizing that it applied to purchasers, because the object of the Kansas conservation statute (K.S.A. 55-703) could not be accomplished "unless the taker or purchaser can be controlled." *Northern Natural Gas Co. v. State Corporation Commission,* 188 Kan. at 360. But the U.S. Supreme Court had no trouble with this. Merely because some of the incidences

of the order relate to production and gathering does not bring the order into the ambit of the exemption where other incidences of the order impact directly or indirectly upon transportation and wholesales of natural gas in interstate commerce.

Since the power of Congress under the Supremacy Clause is supreme, it is up to the State of Kansas to mold its policy of regulation of production and gathering so as not to impinge upon the exclusive jurisdiction of FERC over interstate transportation and wholesales.

The U.S. Supreme Court in *Northern* said:

"The Natural Gas Act precludes not merely direct regulation by the states of such contractual matters. . . .

"The federal regulatory scheme leaves no room either for direct state regulation of the prices of interstate wholesales of natural gas, [citation omitted] or for state regulations which would indirectly achieve the same result." 372 U.S. at 91.

Since the *Northern* case, there have been a number of additional holdings in an unbroken line of cases saying the same thing. *Public Service Com'n v. Federal Energy Reg.*, 610 F.2d 439 (6th Cir. 1979).

It is respectfully submitted the order of the KCC under attack is invalid.